87 So.2d 16 (1956)
Gerard G. O'CONNOR
v.
AMERICAN MUTUAL LIABILITY INS. CO.
No. 20782.
Court of Appeal of Louisiana, Orleans.
April 23, 1956.
*18 Kenneth V. Ward, New Orleans, for plaintiff-appellant.
Alfred C. Kammer, New Orleans, for American Mut. Liability Ins. Co., defendant and appellee. Chaffe, McCall, Phillips, Burke & Hopkins, New Orleans, of counsel.
Oliver S. Delery, New Orleans, for Board of Adm'rs of Charity Hospital of Louisiana at New Orleans, intervenor.
McBRIDE, Judge.
Gerard G. O'Connor, alleging that when he was shot by a bandit on April 15, 1955, he was in the employ of Elmer's Fine Foods, Inc., brings this suit against its workmen's compensation insurer for compensation at the rate of $30 per week for 400 weeks. It is represented that the injuries arose out of the employment and rendered him totally and permanently disabled from doing work of any reasonable character. Plaintiff prays also for an allowance for medical expenses and for statutory penalties (under LSA-R.S. 22:658) for defendant's failure to pay him compensation as it became due. Defendant denies liability for any compensation whatever; that O'Connor was an employee of Elmer's Fine Foods, Inc., is specially denied.
After a trial on the merits of the case, the suit was dismissed and plaintiff has appealed. The judgment also dismissed the intervention which had been filed by Board *19 of Administrators of Charity Hospital of Louisiana at New Orleans claiming $185.70 which represented the cost of medical care and hospitalization furnished plaintiff, but as no appeal was taken from that part of the judgment, the said incidental demand is no longer a part of the case.
Plaintiff's business connection with Elmer's Fine Foods, Inc., commenced on April 11, 1955, when he called at the office of said concern seeking a "selling job" and was referred to Joseph Elmer, its vice-president and general manager. Plaintiff acquainted Mr. Elmer with the fact he was an experienced route worker, but was told there were no route openings just then. However, Mr. Elmer stated that if plaintiff would be willing to undertake the building up of a route of his own, he would be treated the same as the other routemen. Plaintiff made it plain that he was without funds and could not even finance the original merchandise he was to handle. Mr. Elmer thereupon told him that in order to help him get started and also hoping to augment the company's sales, he would permit plaintiff to utilize an old automobile the company owned but did not use. He also stated that he would furnish fuel for the truck and supply the merchandise. O'Connor was given to understand that he could call on prospective customers within the city of New Orleans, except he was not to solicit certain establishments, such as supermarkets, with which Elmer's Fine Foods, Inc., had special arrangements.
Plaintiff accepted the offer. Each day there was turned over to him a quantity of merchandise which, after being inventoried, was loaded by plaintiff aboard the truck. He went out with the truck and canvassed likely establishments on April 11, 12, 14 and 15, 1955, and at about 12 o'clock noon on the last mentioned date he was held up and shot in the left wrist by a colored youth who made off with his sales receipts. The assault took place while plaintiff was in the act of calling on a customer.
At the conclusion of each day he worked, plaintiff would return to the office of the company, account for all unsold merchandise, and turn in to the company's representative the day's receipts for sales made. The "sales slips" would be checked and the company's representative would pay him a 20 per cent commission on the gross amount of his sales.
O'Connor's duties entailed more than just calling on retail establishments and making sales. The company required him to keep certain written records. For instance, with each sale he had to fill out sales slips in duplicate on blanks furnished by the company, one of which was given to the customer and the other was turned in at the end of the day. Then there was the leather route book into which O'Connor had to enter the names and addresses of the customers and list the establishments at which he placed racks. We understand these racks, made of wire, are furnished by Elmer's Fine Foods, Inc., to the retailer for displaying merchandise.
The record shows another feature of the relationship between the parties which seems to us to be of marked significance. On occasions a customer along the route would ask for a product or article not carried by Elmer's Fine Foods, Inc. Joseph Elmer admits that on such occasions in "an effort to help" O'Connor, he would secure the merchandise desired by the customer from whichever concern handled it and turn it over to O'Connor for delivery to the customer. Apparently O'Connor was not informed of the price at which Mr. Elmer purchased such merchandise, but after selling it to his customer he would remit the full proceeds of the sale along with the proceeds from his regular sales. On such transaction defendant paid him the usual commission of 20 per cent of the amount of the sale.
The initial question presented for determination is whether O'Connor occupied the status of an employee or was engaged in reselling products which he bought from Elmer's Fine Foods, Inc., as an independent merchant.
A decision on the question whether a worker is an employee within the meaning *20 of the Workmen's Compensation Statute or is to be placed within another category is not always easy to reach. Scarcely any general test can be applied to the cases. Power of control and superintendence and the right to "fire" or discharge by the employer are usually standards for making the test, but the Supreme Court has said the better policy is to judge each case on the circumstances and let the principle of stare decisis govern. See Bell v. Albert Hanson Lumber Co., Limited, 151 La. 824, 92 So. 350. Usually where the right to direct or control exists there is to be found the employee relationship, but merely because a manufacturer or wholesaler assigns to a peddler or to a retailer a certain territory and limits the sales to that territory does not of itself show that he is an employee. Nor does the fact that a manufacturer or wholesaler retains the right to discontinue selling to a retailer, which would be tantamount to discharging him, justify the conclusion that the retailer is his employee. See our discussion of these points in Buettner v. Polar Bar Ice Cream Co., Inc., La. App., 17 So.2d 486.
In analyzing the facts of each particular case, it is necessary to consider, in addition to the power of control and supervision and the employer's right to discharge, such things as whether the claimant earned wages, or that he was or was not hired by the job rather than by the hour, day or week, or that he did not furnish his own transportation, or that he was or was not carried on the payroll. No one of these factors is conclusive. However, the circumstances revealed by the instant record, although if each stood alone it possibly might not make it certain that the employee relationship actually existed, present a formidable chain of circumstances which goes far to demonstrate that plaintiff was an employee and not just an enterpriser and not just buying and reselling merchandise for his own account. The circumstances we refer to are plaintiff's selling of merchandise which Mr. Elmer bought for resale from other dealers and which plaintiff disposed of on a commission basis; the supplying of merchandise each morning to O'Connor without exacting payment therefor; the furnishing of the truck and the fuel therefor without cost or expense to plaintiff; the requirement that plaintiff make daily remittance of the full amount received from his gross sales; and the keeping of the records. Another requirement was that Mr. Elmer be kept "posted" of plaintiff's whereabouts each day "in case there was an emergency." This latter feature of the contract between the parties shows one thing above all and that is that Elmer's Fine Foods, Inc., retained and exercised absolute and positive control and superintendence of the movements and activities of plaintiff. The language of the Court of Appeals of New York in Glielmi v. Netherland Dairy Co., Inc., 254 N.Y. 60, 171 N.E. 906, 907, fits the plight of O'Connor perfectly:
"* * * He is bound hand and foot as long as he works the route at all, his freedom an illusion, and his independence but a name."
As against all of the above, the only element in the case which might appear to be favorable to defendant is the fact that O'Connor was not carried on the payroll of Elmer's Fine Foods, Inc., and that the usual withholdings for income, unemployment and social security taxes were not made. However, this is unimportant in view of the many factors pointed out above which show beyond doubt that plaintiff was in the employ of said concern.
A conclusion that O'Connor was an employee within the purview of the compensation statute is inescapable. In Buettner v. Polar Bar Ice Cream Co., Inc., supra, the deceased worked regularly as a peddler of ice cream manufactured by the defendant by buying it from defendant and selling it at a profit for a fixed price. The deceased's route was defined by agreement with defendant; he was subject to dismissal at any time; and the car he drove was financed through the defendant and bore the latter's advertising matter. We regarded deceased as an employee whose dependents were entitled to compensation.
*21 We discern a close analogy between O'Connor and the plaintiff in Blackburn v. Chenet, La.App., 42 So.2d 288. The defendant there owned several mules and wagons which were used by various other persons in the peddling of fruit and vegetables; defendant provided the funds to each driver to purchase the stock. At the termination of each venture, out of the gross sales there was first refunded to defendant the amount he had advanced. The balance remaining was divided between defendant and the peddler. We held the latter to be an employee.
Defendant has cited Durant v. Industrial Lumber Co., Inc., La.App., 6 So.2d 164, but we find it entirely dissimilar to the instant case and agree with the holding of the court that the plaintiff was an independent contractor not entitled to recover workmen's compensation benefits.
Unquestionably O'Connor's occupation falls within the provisions of the statute by virtue of the employer's business being of a hazardous nature. While the record does not show whether Elmer's Fine Foods, Inc., is a manufacturer or wholesaler, or if its business is one of those designated by the statute as being hazardous, it in fact became hazardous by virtue of the operation of motor vehicles in pursuit of the business. In Haddad v. Commercial Motor Truck Co., 146 La. 897, 84 So. 197, 9 A.L.R. 1380, the Supreme Court held that the business of hauling, though not specifically designated as being hazardous, becomes hazardous if motor vehicles are used on the theory that the driving of such vehicles involves the operation of engines which is specifically made hazardous by the terms of the statute. It has been held that when an employee of an insurance company, a retail clothing establishment, or a beer parlor uses a motor vehicle in the discharge of a part of his duties, this makes the business a hazardous one. Reagor v. First Nat. Life Ins. Co., 212 La. 789, 33 So.2d 521; Richardson v. American Employers' Ins. Co., La.App., 31 So.2d 527; Crews v. Levitan Smart Shops, Inc., La.App., 171 So. 608. In Snear v. Eiserloh, La.App., 144 So. 265, we held that an employee who merely engaged in loading a motor truck was in "hazardous employment."
Counsel for defendant in oral argument contended that O'Connor's injury at the hands of the bandit did not arise out of the employment and is therefore not compensable. Our conclusion is that for two reasons the assault committed by the third person can be said to have arisen out of the employment. The first reason is that the employee's duty required the carrying of the cash receipts of sales on his person which certainly tended to expose him to a greater possibility of criminal assault from a lawless person bent on robbery than an employee not engaged in such employment.
From a leading case on this subject, Myers v. Louisiana Ry. & Nav. Co., 140 La. 937, 74 So. 256, 257, in which a number of authorities were cited and discussed, there evolved the following rule:
"The test to determine whether injuries to a workman arise out of his employment is not whether the cause of the injury, that is, the agency producing it, was something peculiar to the line of employment, but whether the nature of the employment was such that the risk from which the injury resulted was greater for the workman than for a person not engaged in the employment."
The rule above set out was applied in Dyer v. Rapides Lumber Co., 154 La. 1091, 98 So. 677. The deceased who was hired by the defendant as an engine tender was shot and killed by an unknown assailant during the nighttime in an isolated area. The Court, holding that the death arose out of employment, stressed the increased opportunity for an assault from ambush afforded by the nighttime work hours and by the stooped position required in stoking the boilers.
In Ferguson v. Cady-McFarland Gravel Co., 156 La. 871, 101 So. 248, the deceased was employed in defendant's gravel pits and was forced to work in close proximity *22 to a fellow employee who had shown considerable animosity toward him. One day while deceased was in a stooped position he was struck on the head by an iron instrument wielded by his enemy. Compensation was allowed. The Court found that deceased's employment increased the risk of assault by bringing him in daily contact with his enemy.
The second reason for saying that the injury arose out of the employment is that the employment subjected plaintiff to a peril which came from the fact that its duties required that he be in the place where and when the bandit committed the assault upon him.
In the comparatively recent case of Edwards v. Louisiana Forestry Commission, 221 La. 818, 60 So.2d 449, 451, a towerman in defendant's employ left the tower on which he was stationed and descended to the ground to rescue a child from the attacks of a vicious dog and in doing so sustained an injury. It was held that such injury arose out of and in the course of the employment within the provisions of the Act for the reason that the employee was required to be in the place where the injury occurred. The Court in its original opinion said:
"After a very exhaustive review of the subject, the court concludes that under the broad view now taken of these statutes * * *."
and then quoted the following language from Hartford Accident & Indemnity Co. v. Cardillo, 72 App.D.C. 52, 112 F.2d 11, 15, certiorari denied by the United States Supreme Court, 309 U.S. 689, 60 S.Ct. 891, 84 L.Ed. 1032:
"`* * * no more is necessary than that the work subject the employee to a peril which comes from the fact that he is required to be in the place where it strikes when it does so. It is immaterial whether the place is the employer's premises or a street; whether the risk arises from physical features or human agencies connected with the place; whether it is a common occurrence or an extraordinary happening; one which threatens only employees at work or others also.'"
Although the provisions of the Compensation Act fix the benefits to an injured employee, or his dependent in the event of his decease, on the basis of certain percentages of the wages earned by the employee, it was not the intention of the lawmakers to restrict the workmen's compensation benefits to wage earners alone. Because the employee was working for a commission and not for a salary when injured does not render the Workmen's Compensation Act inapplicable to him. It has been held that a taxicab driver or an automobile salesman who works for a commission is embraced within the protection of the Act. See Coats v. Windsor, La. App., 167 So. 483; Plick v. Toye Bros. Auto & Taxicab Co., Inc., 13 La.App. 525, 127 So. 59. In several cases employees doing piecework and not working for regular wages were held to come within the compensation law. Calhoon v. Meridian Lumber Co., 180 La. 343, 156 So. 412; Dick v. Gravel Logging Co., Inc., 152 La. 993, 95 So. 99; James v. Hillyer-Deutsch-Edwards, Inc., 15 La.App. 71, 130 So. 257; Jones v. Landry, 10 La.App. 740, 122 So. 913. In principle we cannot distinguish any of these cases from the instant one.
During the three and one-half days he worked the route before being shot, O'Connor's sales aggregated $57.99, and he was entitled to a commission of 20 per cent of this amount, or $11.60, and dividing said amount by 3.5 would give the average daily rate of earnings as $3.31. Projecting this daily rate of pay for a 5-day week, which was what the contract of employment contemplated, would bring the earnings to $16.55 for a full week. This is the formula used by the courts in several cases to arrive at the weekly rate of pay of an employee hired at an hourly rate but who does not work the full week for the employer and we can think of no better method for computing O'Connor's weekly wage. See Calhoon v. Meridian Lumber Co., supra; Rylander v. T. Smith & Son, *23 Inc., 177 La. 716, 149 So. 434; Coats v. Windsor, supra. In Hayes v. Barras, La. App., 6 So.2d 66 (writs refused), the plaintiff had been hired at 30 cents an hour for a 3-hour job loading a truck and was injured shortly after beginning the work. The court multiplied the hourly rate of pay by the number of hours the employee would have worked had he been employed for a full week and computed the amount of his earnings to be $14.40 for a full week and used this figure as the basis for the compensation award.
The specific purpose for which O'Connor was hired and for which he engaged himself was to "build up" his own route, and we cannot indulge in conjecture, as his attorney would have us do, as to what his earnings might have amounted to at some future time. O'Connor cannot arbitrarily be put on a parity with the other routemen who might have been more established in their activities so as to make their earnings the criterion for establishing the weekly amount of compensation due O'Connor. We think that a new worker who is injured at a time before his true earning capacity is attained must nevertheless be satisfied with compensation based on the beginner's wage. As the Court of Appeal for the Second Circuit in Coats v. Windsor, supra [167 So. 485], said:
"* * * but the statute is only intended for financial compensation and not for general relief, and some basis upon which to fix the compensation due must necessarily be fixed, although in some individual cases, as here, a hardship might inure, due to the unusually low wage at the time of the accident."
Counsel also urges us to adopt the figure of $50 per week as the compensation base for the ascribed reason that Mr. Elmer testified that his "regular salesmen were on a guaranteed salary of $50 a week and up." We have carefully read that portion of the testimony and do not interpret the statement made by Mr. Elmer to mean that the guaranteed wage applied to any of the routemen as it clearly appears Mr. Elmer was speaking with reference to his salesmen as contradistinguished from the route workers. But even if it be conceded that the other routemen were guaranteed a weekly wage of "$50.00 and up," still the plaintiff cannot claim that the arrangement with the other men applied to him as there was no such understanding in his contract of hiring. He was to receive a commission equal to 20 per cent of the gross sales he made without any guarantee of a minimum wage.
The brigand's bullet caused plaintiff to suffer a comminuted fracture of the left wrist for which injury he was treated by the physicians at Charity Hospital, none of whom appeared in court as witnesses. The only medical evidence concerning plaintiff's condition we have before us is the hospital record and the testimony of the three physicians who examined him on various dates after June 1, 1955, which was when the plaster cast placed on his arm at the hospital was removed.
Dr. Blaise Salatich, who is an orthopedist, appeared as plaintiff's expert. He saw and examined O'Connor on July 1 and December 27, 1955, finding a healed comminuted fracture of the left wrist with a multiplicity of metal fragments (from the bullet) imbedded in the flesh. On both examinations Dr. Salatich noticed a limitation of the motion of the plaintiff's wrist and while it appeared to him there had been some improvement in the interval between examinations, he thought there would be a permanent residual. With reference to O'Connor's ability to return to his work, his opinion was that while O'Connor might be able to carry on his former duties, he would have to do the work in pain. It might be stated that on the date of the second examination O'Connor was in the employ of the cleaning and pressing concern. When asked if he could state positively that O'Connor was experiencing pain, Dr. Salatich made this significant statement:

*24 "It's quite possible he can have pain. I have no means of being absolutely positive, only what the man says."
Dr. George Berkett, a specialist in orthopedics, examined plaintiff on behalf of defendant on June 6 and December 27, 1955. The cast had been removed from O'Connor's arm five days prior to his first examination. Dr. Berkett's finding on the earlier examination was that the patient had excellent function and range of motion of the left wrist but with some limitation and his prognosis was that within a month to six weeks the motion should be normal. On the December 27th examination Dr. Berkett found no residual whatever.
Dr. Edward T. Haslam, an expert in the field of surgery, saw and examined plaintiff twice, the first time on September 7 and again on October 6, 1955. His opinion was that the metal fragments were insignificant. He finally concluded that plaintiff had suffered a 10 per cent permanent loss of the use of the function of the left arm due to limited motion of the little finger and a 20-degree lack of dorsiflexion, but he saw no reason why O'Connor could not return to work driving the motor truck and carrying on the duties of routeman.
The learned trial judge, according to the reasons for judgment he gave, dismissed the suit believing that plaintiff was an independent contractor and not entitled to the rights and benefits of the compensation statute. Of course, in that conclusion our brother was in error. However, the judge went a bit further and stated in his reasons that he was impressed by Dr. Haslam's opinion that O'Connor had incurred the 10 per cent loss of the use of his left arm. Dr. Haslam's statement likewise makes impression on us. The doctor seems to have been most fair in making appraisal of plaintiff's condition and our opinion is that O'Connor did suffer a permanent partial loss of the use and function of the member as stated by Dr. Haslam, but, in spite of this, he is physically competent to resume his former occupation or to engage in activities similar thereto.
The fact that O'Connor holds the job of routeman with his present employer in the cleaning and pressing business supports Dr. Haslam's conclusion that the partial loss of use of the function of the arm is not disabling to any extent and will not interfere with his ability to do his work. The plaintiff pretends he can do little with his left hand but admits he can drive a Chevrolet automobile on his route. However, he says he experiences an annoying pain, a sort of numbness, which cold weather tends to aggravate. None of the physicians, except Dr. Salatich, saw any reason for the pain and Dr. Salatich acknowledged that he has no way of knowing positively if plaintiff's complaints of pain are genuine other than from plaintiff's statements to him.
As between plaintiff's present occupation and his former employment, we can discern no material difference. `His present job is to build up a route for the cleaning and pressing company. He was employed to build up a route for Elmer's Fine Foods, Inc. Both occupations entailed his driving of a motor vehicle. He now drives a Chevrolet car but formerly drove a Ford ½-ton panel truck, and it is a well-known fact that both types are light vehicles. In the former job O'Connor loaded candy and confections onto the truck and by his own statement it took him but 5 or 10 minutes to load his stock in trade each morning. Plaintiff says some of the packages of confections weigh as little as 5 ounces and a carton of them weighs only a few pounds. The weight of a box of 24 bars of candy is a little in excess of a pound and the jars of candy he handled weighed between 2 and 3 pounds. He maintained that it was necessary to lift packages weighing up to 30 pounds which he says he can no longer do, but we are inclined to believe that this statement of plaintiff is somewhat of an exaggeration. The duties of the present job require the lifting and carrying of all types of wearing apparel to and from the automobile. The record gives us no inkling as to what these articles might weigh, but we do not think *25 that his present duties are any less arduous than those which he formerly performed.
O'Connor never attempted to return to work for Elmer's Fine Foods, Inc., and he states he was totally incapacitated until September 7, 1955. We know that his arm was in the cast until June 1, 1955, and it necessarily follows that he could not do work prior to that date. Whereas Dr. Berkett believed when he saw plaintiff on June 6 that all disability would disappear in from 4 to 6 weeks, we conclude that plaintiff was disabled until September 7 when he found the new job of building up the cleaning and pressing route.
Plaintiff's disability was temporary but total for a period of 21 weeks and if an award of compensation were to be made on the basis of temporary total disability he would be compensated under LSA-R.S. 23:1221(1) at the rate of $10.75 (65 per cent of $16.55) per week or to the extent of $225.75. But he has sustained a 10 per cent loss of the use of function of his left arm and therefore the weekly amount of compensation payable must come under the provisions of the statute relating to specific loss. The correct method for computing compensation for the permanent partial loss of use of the function of a member is to take the proportion of the partial loss from 65 per cent of the weekly wage and allow such amount as compensation for the number of weeks permitted for the total loss of the respective member. Cooper v. Employers Liability Assurance Corporation, Limited, La.App., 80 So.2d 180; Morgan v. Standard Accident Ins. Co., La.App., 51 So.2d 107; Storm v. Johnson, La.App., 23 So.2d 639; Smith v. Turner Lumber Co., La.App., 174 So. 699; Thornton v. Haynesville Lumber Co., Inc., La.App., 155 So. 784. The pertinent provisions are LSA-R.S. 23:1221(4) (f, n, o) and the result is that the compensation rate is 10 per cent of 65 per cent of $16.55 or $1.07 per week for 200 weeks, but as LSA-R.S. 23:1202 establishes the lowest or minimum rate of compensation at $3 per week, plaintiff is entitled to said minimum sum each week for a period of 200 weeks.
An injured workman cannot recover compensation both for specific loss, such as a partial loss of the function of any member, and for temporary total disability. LSA-R.S. 23:1223 provides that where compensation has been paid under the disability provisions the amount of such payments shall be deducted from any compensation allowed for a specific loss, but as no payments at all have been made O'Connor is entitled to compensation for the permanent partial loss of function of the member which is greater than any compensation he would receive under the disability provisions. See Cooper v. Employers Liability Assurance Corporation, Limited, supra; Storm v. Johnson, supra; Ferguson v. Kellogg Lumber Co., La.App., 200 So. 36; Franklin v. Louisiana Highway Commission, La.App., 152 So. 604; McBride v. Natural Gas & Fuel Corporation, 9 La.App. 513, 119 So. 722.
In addition to the award for workmen's compensation at $3 per week for 200 weeks, plaintiff is entitled to recover the sum of $20 which he expended for X-rays in connection with his injuries.
Dr. Salatich's fee as an expert witness is fixed at $100, which is in line with previous allowances made by this court to medical experts. He presented two bills for the sum of $25 each for services rendered in examining plaintiff, but, of course, neither the doctor nor plaintiff can recover the amount of the bills. We are unaware of any provision of law which makes the defendant in a workmen's compensation suit liable for the bill of a physician for examining an injured workman when the sole purpose of the examination is to acquaint the physician with the workman's condition and prepare him to testify in the case as an expert witness. All the physician is entitled to is a fee for giving testimony as a expert witness and this fee is to be fixed within the sound discretion of the court.
Plaintiff claims the penalties provided for by LSA-R.S. 22:658 for defendant's failure to make payment of compensation *26 within 60 days after receipt of proof of loss. We do not think that the penalties provided for in said statutory provisions should be imposed in this case for the reason that there is nothing in the record to indicate that the failure to make payment of the claim was to any extent arbitrary, capricious or without probable cause. The defendant took the position all along that the plaintiff was not an employee of the insured and evidently it acted on the advice of its attorneys and in good faith on a debatable question. We see no reason whatever for saying that defendant is amenable to any penalties.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered, adjudged and decreed that the plaintiff have judgment against defendant for workmen's compensation at the rate of $3 per week for a period of 200 weeks commencing as of April 22, 1955, together with legal interest on each overdue installment from its due date until paid, plus $20 for medical expenses and for all costs in both courts. The fee of Dr. Blaise Salatich as an expert witness is fixed at the sum of $100 and is taxed as an item of costs.
Reversed.