92 So.2d 152 (1957)
Mrs. Mildred Bernard SAMSON, Plaintiff-Appellee,
v.
The BORDEN COMPANY, Defendant-Appellant.
No. 4286.
Court of Appeal of Louisiana, First Circuit.
January 2, 1957.
Rehearing Denied February 4, 1957.
Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for defendant-appellant.
John L. Avant, Baton Rouge, for plaintiff-appellee.
TATE, Judge.
Defendant Borden Company appeals from the award of workmen's compensation benefits to Wickliff Samson's widow and children for his death.
Samson was admittedly killed on August 28, 1955 in the course of his duties operating an ice cream truck which sold defendant Borden's products. The principal question presented by this appeal is whether Samson was in reality an employee of the Borden Company, as found by the District Court; rather than merely an enterpriser or independent merchant, purchasing Borden's frozen dairy products for resale, as contended by the defendant appellant.
Samson was an ice cream peddler selling Borden's products exclusively. He used a refrigerated vending truck in his operations. This truck had been furnished to him by defendant company, in a transaction in the form of a sale and chattel mortgage with installments spread out over five years.
The substance of the most persuasively presented arguments on behalf of defendant is that Borden simply financed the purchase of the truck by Samson and could only enforce his payment of the monthly installments: Samson was required by no binding agreement to buy Borden's products exclusively; he could resell its products at his own price. Borden did not assign him a set route, nor did it regulate his hours of work. In short, it is contended that Borden exercised no control over decedent.
For, as stated by defendant's brief, "In all of the reported decisions dealing with the issue raised in this case, the initial inquiry made by the court is whether the alleged employer exercised supervision and control, or reserved the right [i. e., had the power] to exercise supervision and control."
*153 Samson, a one-armed war veteran, had peddled ice cream products on a south Baton Rouge route for eight years for Borden's competitor. In June of 1954 he reached an understanding with the Borden Company and commenced selling Borden products from a truck furnished by this latter corporation.
A bona fide sale and chattel mortgage of the truck from Borden was executed, reciting a total debt of $4,537.32, which amount included the purchase price, interest, and property damage insurance premiums for five years. The monthly installments were fixed at $113.44 for the five warmer months (when Samson might be expected to sell more ice cream products) and $81.02 for the seven cooler months of the first two years, and for reduced amounts ($75.62 and $54.02) of the same periods of the last three years.
Concurrent with the sale, Borden agreed with Samson that he would be given a ten per cent rebate on the amount of the wholesale cost of all products furnished to him, said rebate to be applied exclusively to payment of the installments due upon the truck.
Initially, Samson was furnished on credit with a complete inventory of ice cream products. Thereafter, he maintained a "perpetual inventory" of the products on his truck, replacing each morning those items he had sold the previous day. These purchases were made, with rare exceptions, upon a 24-hour credit basis: Samson paid the following day, for the wholesale price of the goods he had taken the morning before.
In deciding whether the alleged enterpriser is indeed an independent merchant retailing products purchased from a favored supplier, or instead in reality an employee working on a commission basis, the courts have uniformly examined the total economic relationship between the parties. Indicia which individually might not indicate other than a customer relationship, may in combination present a picture of practical economic control and direction by the supplier so as to constitute him for purposes of workmen's compensation, at leastas the master or employer of the other. Buettner v. Polar Bar Ice Cream Company, Inc., La.App. Orleans, 17 So. 2d 486, certiorari denied; Blackburn v. Chenet, La.App. Orleans, 42 So.2d 288; O'Connor v. American Mutual Liability Insurance Company, La.App. Orleans, 87 So.2d 16.
Based upon a consideration of the entire economic relationship, we think the District Court correctly concluded that Samson was in reality a servant or employee engaged to sell Borden ice cream and dairy products, subject to Borden's practical control or power to control his physical conduct in the performance of these services.
Among the indicia which we feel to be relevant in combination, although individually each might not prove the relation, are:
1. Borden sold Samson's truck to him without any downpayment and entirely on credit, despite an extremely unfavorable credit report, although Borden was not in the business of selling or financing automobiles. Due to the usual financing provisions, the entire balance was accelerated upon non-payment of any installment due. Yet, although most "Red Wing" dealers (the trade-name for Borden's peddlers) were like Samson always delinquent, no foreclosures had ever been instituted; nor had any truck of the 7 or 8 so purchased ever been paid out in full although several had been turned in upon termination of the relationship. Counsel for plaintiff observes as to this: "Clearly the Borden Company did not care if a peddler ever paid for a truck as long as he sold ice cream. The deeper a peddler was in debt to Borden's and the more he was delinquent naturally the more he would be subservient to the company."
2. The "Red Wing" truck peddlers alone of all Borden's retailers received a *154 10% rebate on their gross wholesale purchases, which however was not paid in cash but was only applied as a credit upon the note for purchase of the truck. The District Court further found that other than these 10% rebates, no other payments were expected or made to meet the monthly chattel mortgage installments, which were fixed at a figure so as to require a volume of sales at 10% thereof which as a practical matter was never made. Samson was in a state of perpetual delinquency, so that Borden's had the right to terminate the relationship at any time, reinforced by its power to obtain a large deficiency judgment.
3. Samson had a given territory in north Baton Rouge, which he commenced working the day he commenced working for Borden, although for the previous eight years he had worked a south Baton Rouge territory for Borden's competitor.
4. Although Borden's officials with unusual vagueness were unable to testify whether Borden had a fixed or usual trade price for its products in Baton Rouge, or whether Samson sold Borden's products at such prices, it was proven that on at least one occasion, Samson participated in a special sale by Borden's selling one-half gallons of ice cream for sixty-nine cents, having such advertising stickers placed on his truck. (He purchased same daily at the usual wholesale price of eighty cents, but received an additional rebate credit at the end of the month so that the net amount he paid was below the selling price.)
5. On the Sunday of his death, Samson's wife was sick and he had intended to stay home until he received a call from his sales manager at Borden's. The sales manager testified that he had merely suggested that Samson go to an air show being staged at Ryan Air Field, where he could sell a lot of ice cream. In any case, Samson left, despite his contrary personal intentions and inclinations, and was killed en route. Mrs. Samson testified that on at least several other occasions she had been present when Samson received a telephone call from Borden employees which she interpreted as directions for him to report to work somewhere; the Borden employee involved "did not think" he had called Samson at home other than on this occasion.
6. Samson's truck was marked with the scalloped "Red Wings" insignia, a Borden trade-name; and it bore at various times Borden advertising matter, advertising Borden specialties and products. Samson's truck sold Borden products exclusively, even in the winter months when his income from these frozen dairy products was in the area of only $50.00 per month.
7. Borden's took out liability insurance with its insurance agent on his truck for $100,000 per person, $300,000 per accident, without consulting Samson; it simply paid for same and charged it to his account.
8. Borden's had denoted Samson's truck as "Red Wing No. 71", and maintained through its Houston office detailed records of sales on it and the various other trucks operated through the Houston division in the same manner.
9. Borden's had sent a safety lecturer to ride with Samson and the other "Red Wing" operators.
10. During the entire fourteen months Samson used the truck furnished by Borden's, his children or wife had never once been permitted to ride in it, even around the block. His wife was prevented by objection of counsel from testifying as to why or under whose orders he had not felt free to let his two little boys ride in this shiny, white musical truck.
11. Each night during this entire fourteen months, the refrigerated truck was left at the Borden plant, where Borden furnished without charge electrical current to refrigerate the truck.
12. Following the accident, Borden officials removed the ice cream products and directed that the damaged truck be taken to a certain garage, without consulting *155 Mrs. Samson as to this disposition of "Samson's" goods and truck.
Each of these facts individually tends to show a relationship between Borden and Samson closer than wholesale and retailer, or Borden's greater control of him than such a relationship entails. Individually each might be explained, as able counsel for defendant has attempted to do.
But the total picture deducted from these facts is that of an employee no different than a salesman furnishing his services on a commission basis (i. e., the difference between the wholesale and retail price), in a given territory and in a vehicle furnished by the company (although he might be expected to pay the oil and gas therefor), which vehicle will be returned to the company after termination of the employment which employment the company has the power to terminate at any moment. Like any salesman, he might have a certain amount of discretion as to the exact hours he worked on a given day, and the exact route he might take; which discretion is subject to the practical necessity of selling a sufficient volume to earn a living and to avoid the termination of the employment. Like any salesman, he was free to quit, or to disregard suggestions of his sales managers upon possible penalty of termination, if he wished or did not fear to earn his living another way or with another employer (and if the possibility of a large deficiency judgment held no terrors for him.)
On paper, this control might not have existed; in actual fact, it did.
It should perhaps be remarked that the District Court specifically remarked upon the evasiveness and reticence of defendant's officials and employees testifying to facts which they alone could (and should) have known, Samson himself being dead and his widow prevented by objection of counsel as hearsay from testifying as to what he had told her were his instructions and working conditions.
The Buettner, Blackburn, and O'Connor cases, supra cit., all involved peddlers in similar circumstances seeking compensation; and in each case, an employment relationship was held to exist. The Buettner case involved an ice cream peddler vending the supplier's products exclusively in a vehicle nominally owned by the peddler, as did the Matter of Glielmi v. Netherlands Dairy Company, 254 N.Y. 60, 171 N.E. 906, wherein in holding that a masterservant rather than independent merchant relationship existed, Mr. Justice Cardozo commented as to the status of the peddler, "He is bound hand and foot as long as he works the route at all, his freedom an illusion, and his independence but a name," 171 N.E. 907.
The sound economic purposes which Borden might have in vesting title to its vending trucks in its peddlers (e. g., more careful usage, more economical operations) are of course not to be criticized. But however commendable this economic and bookkeeping device may be, it cannot screen for purposes of determining liability in compensation the real and efficient control exercised or exercisable by Borden in the use of these peddlers in carrying out Borden's economic activities.
For the above and foregoing reasons, the judgment of the District Court is affirmed.
Affirmed.