LOTTINGER, Judge.
This is a suit under the Workmen’s Compensation Laws of the State of Louisiana, LSA-RS 23:1021 et seq., for total and permanent disability resulting from an accidental injury sustained by plaintiff in the course of his alleged employment with Stanley W. Gates, the defendant. The trial court, for oral reasons, held that plaintiff was engaged in a hazardous occupation, that plaintiff was employed by defendant, and that the accident occurred while plaintiff was in the course of said employment, so as to entitle plaintiff to compensation for said injury. The lower court found disability at 50% of the loss of a hand, and rendered judgment at $15 per week for 150 weeks commencing April 19, 1949, with 5% interest thereon per an-num on all deferred payments until paid;, plus $131.30 for medical expenses, with 5% interest per annum thereon from date of judicial demand until paid, plus all costs. Both parties appeal, plaintiff requesting that said judgment be increased.
The accident occurred on April 19, 1949, while plaintiff was engaged in cutting timber into ties on the Grabbert property in Calcasieu Parish, Louisiana. He would cut the timber into logs and haul the logs to a sawmill owned and operated by a Mr. Goss. The mill would then cut the logs into ties and plaintiff would haul the ties, in his own truck, to locations specified by Mr. Godair, defendant’s supervisor. Defendant would pay plaintiff at the rate of 650 per tie. Out of said sum, plaintiff would pay a helper at the rate of $25 per week and would pay all gas and oil required in operating the mill and his truck. Goss would receive the trimmings and sidings from the logs as his compensation. Plaintiff had been engaged in these operations for defendant since the latter part of 1948. In said operations he was required to use an axe, cross cut saw, log chain and log hook.
At the time that plaintiff entered the scene of these operations, the cutting of ties was being done at a place called Hecker. The entire operation was then conducted by Goss. Upon being approached by plaintiff, Goss agreed to let plaintiff cut the timber, and both plaintiff and Goss approached Godair with the request that Godair issue a check directly to plaintiff for the number of ties cut, which request was agreed to by Godair at that time. The *861 record also shows that Goss received a certain price per tie while the operations were conducted at Hecker, in addition to the siding- and trimmings. During the beginning of 1949, the exact date is not clear, it appears that all the timber was cut on said tract, and it was necessary to move to a new location. The evidence shows that the arrangements for purchase of the timber on the Gabbert tract was made by Godair. He agreed, with Gab-bert, that payment for timber cut would be by checks on the defendant’s company. It appears that Gabbert and Godair selected the timber to be cut, and an agent of Mr. Gabbert marked the trees to be cut.
Upon moving from Hecker to the Gab-bert tract, it was necessary to move the mill to the new location. Plaintiff testified that the site for setting up the mill on the new location was selected by Godair. Godair testified that he did not select the site, but that he did show plaintiff the extent of the Gabbert tract so that plaintiff would not set up the mill elsewhere and thus be guilty of trespassing. The mill was moved to the new location by plaintiff and Goss.
Defendant’s supervisor, Mr. Godair, went to the scene of the operations approximately once a week. At times he would direct plaintiff as to how the timber should be cut. Gabbert would be paid a stipulated price per tie, depending on the size and the quality of the timber cut. The evidence shows that, at times, deductions were made from plaintiff’s checks for compensation insurance. However, it was not clearly shown whether said deductions were made prior to the accident or subsequent thereto. Nevertheless, the plaintiff was not so covered at the time of the accident.
Plaintiff introduced into evidence statements given him by defendant showing the amount of ties delivered by plaintiff, and the prices therefor. These statements also show stumpage paid Mr. Gabbert. Said statements designate the plaintiff as “producer.” One of the said statements (p-11) contains the following notation:
“Mr. Hebert, you have 11 Pine and 1 Gum which are too long. I will pay you for them Fri. if you will cut them off they are measured and marked.
Hereafter all ties must be stacked prop'erly and the two bottom stringer ties must be on blocks 6 in. above the ground and all bark and spurs removed or I cannot pay for them.”
Plaintiff testified that he earned, prior to the accident, in excess of $50.00 per week. This was after all expenses, such as helper, gas, oil, etc., was deducted. Subsequent to the accident, plaintiff attempted to do the same type of labor. However, due to the injury, his ability to do said labor was greatly reduced, and he was replaced by a Mr. Miller. Plaintiff stated that his earning capacity, subsequent to the injury, was about 50% of what it was prior to the accident. After being replaced by Miller, plaintiff secured a job as janitor; his pay for this was $130.00 per month.
Defendant claims that the relationship ■between plaintiff and defendant was that of vendor and vendee. They ' claimed that plaintiff cut the ties and delivered them to the sites where they were to be picked -up by the railroad companies who purchased the ties from defendant. They admitted that they did suggest, at times, how the ties were to be cut, but that same was done because they would not be able to purchase same from plaintiff otherwise, as the ties had to meet specifications of the railroad companies. They claimed" that their action in paying Gabbert directly for the stumpage cut was merely for the purposes of assuring Gabbert that he would be paid the agreed price, and that same assisted plaintiff in that he was relieved from the necessity of keeping records on the timber cut and having to pay Gabbert from the money received by plaintiff.
We believe that the trial court correctly found the relationship existed between plaintiff and defendant to be that of employer and employee. Although defendant claimed that the relationship was *862 that of vendor and vendee, there are certain matters which lead us to believe otherwise. The record conclusively shows that a certain amount of direction and control was exercised over plaintiff by the agent of defendant. We believe that the evidence shows that defendant could have exercised more control over the operations of plaintiff had they so chosen. It was shown that defendant purchased and paid for the timber which plaintiff cut into cross ties; that defendant’s agent, together with Gabbert, pointed out the trees which plaintiff was to cut; that defendant directed the manner in which the ties were to be cut, hauled and stacked; that the relationship could be terminated at any time by defendant; and that, intermittently during the relationship, deductions were made in plaintiff’s paycheck for compensation insurance. Plaintiff, Goss and Miller, the party who took plaintiff’s place after his discharge, all testified that the timber was purchased by defendant; that they cut same for defendant; and that they were paid by the number of ties cut. Miller testified that he saw Godair, defendant’s agent about taking over the plaintiff’s jo'b. He further testified that, on one occasion, he asked Godair about the tops of the trees which were not cut into ties, whereupon, Godair told him that he could have them if he wanted as they, the defendant, had bought them. The evidence shows that plaintiff did not own the trees or had anything to do in regard to acquiring the ownership thereof, or the ties cut therefrom, and therefore, he could not have sold them as is claimed by defendant; he was merely producing the ties for the defendant.
The case of Deason v. Coal Operators Casualty Co. et al., La.App., 43 So.2d 630, 631, is strikingly similar to the present one. In that case, the relationship was held to be that of employer and employee rather than that of independent contractor, as was alleged by the 'defendant. Plaintiff, in that case, was engaged in cutting wood. He used his own trucks and hired and paid his own help. He delivered the wood to the railroad yard, as directed by defendant, and was paid at the rate of $10.50 per cord. He could be moved from one tract of land to another. The court, in that case, said: “The agreement between the parties was verbal. It involved no specified quantity of wood, no specific length of time, and no particular tract of timber. It is clear that either Mr. Davis or Mr. Deason could have terminated the agreement at will. While it does not appear that Mr. Davis exercised any particular supervision over Mr. Deason’s operations, the Court concludes that inasmuch as he could terminate Mr. Deason’s employment at will, he thereby had the effective power to supervise and control Plaintiff’s operations.”
The court, in the Deason case, then went on to hold that case to be in the same pattern as Collins v. Smith, La.App., 13 So.2d 72 rather than that of Murphy v. Tremont Lumber Company, La.App., 22 So.2d 79. In the Collins case again the facts were very similar to that of the present case. There the court held the right to supervise or control, rather than the exercise of said right as the controlling factor to be the distinguishing factor. In the Murphy case, the agreement between the parties was a written contract, which was very complete and extensive, thus rendering the type of agreement entirely different from the present one.
We are inclined to believe that the facts and the law reviewed above indicate the relationship to be that of employer and employee. The arrangements for cutting the Gabbert timber, and the payment therefor, were made between Godair and Gab-bert. Plaintiff had nothing to do with said arrangement except to cut the timber purchased, i. e. the timber pointed out to him by Gabbert and Godair. The evidence shows that his right to cut the timber depended exclusively on his cutting same for the defendant. We do not believe that he could have sold the timber cut to anyone other than defendant. The evidence shows that, after his injury and resulting disability, he was replaced by Miller by arrangement between Godair and Miller, *863 He left a substantial amount of cut timber in the woods at the time of his discharge, for which he was never paid.
This court stated in the case of Thibodaux v. Sun Oil Co., La.App., 40 So.2d 761, “The compensation statute with its amendments, was designed to cover all employees who might reasonably be brought under its protection, and should be liberally construed to that end, irrespective of whether plaintiffs are attempting1 to recover compensation thereunder or are seeking to recover in tort.”
In view of the facts and circumstances as outlined herein and in view of the authorities herein mentioned and in view of the fact that we are inclined to believe and do believe that there was not a bona fide relationship of vendor and vendee between plaintiff and defendant, but that the relationship between them was that of employer and employee, we therefore conclude under the wording and intention of the Louisiana Workmen’s Compensation Law that plaintiff was an employee of defendant and is entitled to recover from the injury sustained.
As a result of the accident, plaintiff suffered a cut on the thumb of his left hand. Three doctors testified as to the disability of plaintiff, which testimony is conflicting. None of the doctors who testified treated plaintiff for the injury, nor did they make an internal examination of the injury. Each of the said examinations was a short time before trial, at which time the injury had healed, leaving a scar. Dr. Snatic testified that plaintiff suffered a cut through the flesh of the thumb which sheared the periosteum from the bone. Half the tendon was cut. At the time of his examination, flexation or extension of the thumb caused great pain to plaintiff because of adhesion of the tendons. Dr. Snatic further testified that fusion of the tendons to the bones and subcutaneous tissues causes a somewhat frozen joint, and that plaintiff “will always have pain as long as those ad-hesions are not broken away”.
Dr. Kushner testified, that, as a result of the injury, plaintiff has lost 50% of the efficiency of his hand. He, like Dr. Snatic, testified that they believed plaintiff unable to return to timber work requiring use of both hands. Both Drs. Snatic and Kushner testified that the thumb pained plaintiff whenever he attempted to flex same. However, they agreed that there was a possibility that such pain -could be feinted by the plaintiff, and that the restriction of movement of the thumb might be voluntary on the part of plaintiff.
Dr. Hatchette disputed the testimony of Drs. Snatic and Kushner. He testified that movement of the thumb by plaintiff was normal. He stated that there was no reason why plaintiff could not return to the same work he was doing prior to the accident. He estimated the disability to the thumb, giving the plaintiff every benefit of a reasonable doubt, at 10%.
The record as to whether plaintiff was totally disabled to do work of a reasonable character is vague and indefinite. Plaintiff testified that he had been a timber man all his life. Mr. Goss, a witness on behalf of plaintiff, testified that plaintiff was an expert timber man, but that he had hauled wood prior to his employment with defendant. We are not favored with the definition of plaintiff’s conception of an “expert timber man”. The record shows that plaintiff returned to the same work for a period of nine weeks subsequent to the accident. During this time he did substantially the same work as he had done prior to the accident. Had he been incapaciated to do work of a “reasonable character”, we do not feel that he would have been able to do the same work for a period of nine weeks so shortly following the accident. Defendant introduced witnesses who testified that they know several men doing similar work to that of plaintiff with missing arms, fingers, etc. In the absence of more proof to the lack of ability of plaintiff to do work of a reasonable character, we would certainly not be justified in reversing the decision of the lower court on so important a point. The record, we believe, indicates that plaintiff was no more than a common laborer. His work was similar to that under consideration in *864 Scott v. Hillyer, Deutsch, Edwards, Inc., 217 La. 596, 46 So.2d 914, wherein plaintiff was held to he a common laborer, although his work was similar to that of plaintiff herein.
Subsequent to the injury, plaintiff continued at the same work for a period of nine weeks, after which time he secured work as a janitor at $130.00 per month. In Mitchell v. T. J. Moss Tie Co., La.App., 27 So.2d 385, 387, the court said:
“In the instant case, there is abundant proof as to the ability of the plaintiff to continue to work as a common laborer. There is even some persuasive testimony to the effect that plaintiff could continue to perform the work of loading cross-ties, in which labor he was engaged at the time of the injury, and, while we do not accept this as having been completely established, we do find from the facts adduced that plaintiff is not disabled from performing work of a nature and character similar to that in which he was engaged prior to his injury.
“It is required that the plaintiff establish his claim by a preponderance of the evidence, which obligation this plaintiff has failed to fulfill. On the contrary, we find that the evidence definitely preponderates in' favor of the conclusion that plaintiff has not been disabled to the extent of permanent disability to perform work of a similar character to that in which he was engaged.”
During the period from January 7th until April 19th, the date of the injury, plaintiff received checks from defendant in the amount of $990.20. During the three week period in which plaintiff laid off due to the injury, he received two checks totaling $81.80. These checks were obviously for work done prior to the injury, thus making his total gross wages prior to the accident $1072.00. Thus, his weekly gross wages, during the fourteen and one-half week period prior to the accident, was $73.93. During the nine week period subsequent to the accident, plaintiff’s weekly gross wages was in the sum of $63.63. It was shown, that, after the accident, the weather was inclement and that the operations of plaintiff was a greater distance from the mill and in more swampy locations. Therefore, we feel that there was no substantial decrease in the gross earnings of plaintiff subsequent to the accident.
The trial court held that, as a result of the injury, the plaintiff suffered 50‘% loss of the use of his hand. We feel that this finding is substantially shown by a preponderance of the medical testimony. Subsection (5) of paragraph (d) of subsection (1), Section 8 of the Employers’ Liability Act, No. 20 of 1914, as amended, LSA-RS 23:1221 (4)(e), provides: “For the loss of a hand, sixty-five per centum of wages during one hundred fifty weeks.” Subdivision (15), LSA-RS 23:1221(4) (o), provides further that: “In all cases involving a permanent partial loss of the use or function of the members mentioned hereinabove, compensation shall bear such proportion to the amounts named herein for the total loss of such member as the disability to such members bears to the total loss of the member, provided that in no case shall compensation for an injury to a member exceed the compensation payable [under this act] for the loss of such member.”
We, therefore, conclude that plaintiff suffered 50% loss of the use of a hand. Although the expenses of plaintiff for a helper, gas, and oil were in dispute, we believe that said expenses were substantially shown to be about $35.00 per week. Deducting this amount from his weekly gross wages prior to the accident gives him a weekly net figure in the sum of $38.93. Applying the cited subdivisions of the Employers’ Liability Act of this state to the weekly wages of plaintiff, we find that he should have been awarded compensation in the amount of $12.65 weekly during the period of 150 weeks. The remaining portion of the said judgment, concerning medical expenses in the amount of $131.30 is not in dispute.
Accordingly the judgment appealed from is amended 'by decreasing the weekly *865 compensation payments to the .sum of $12.65, and, as so amended, is affirmed at plaintiff’s cost.
Judgment amended and affirmed.