TATE, Judge
(dissenting},
The writer respectfully dissents from' the reversal of the trial court judgment.
The facts are virtually undisputed, and the appeal presents purely a question of law, which the trial court resolved correctly in the writer’s opinion. As the writer shall set forth in more detail, the trial court correctly characterized as a matter of law the relationship between the plaintiff Bryant and Mullins & Parker as that of employer-employee, or principal-contractor, instead of “vendor-purchaser” as held by this court’s majority. . '
The evidence shows that in fact Mullins & Parker had the exclusive control over the plaintiff Bryant’s economic .operation^, which were determined each week in advance by the purchase orders 'given to Bryant by Mullins & Parker on the preceding Saturday: these alone determined the extent and nature of Bryant’s pulpwood activities during the following week. Further, in performing his work to fulfill these purchase orders each week, Bryant was not cutting and hauling pulpwood for him to sell himself to the International Paper Company; he was doing so to fulfill th)e Mullins & Parker purchase-order with International Paper, by which Mullins & Parker had agreed to supply so much pulpwood during the coming week to the International Paper plant.
In short, Bryant was not a seller <?f wood; he was either an employee or independent contractor[1] engaged by Mullins & Parker to supply pulpwood in fulfillment of its contract with the International Paper Company. As such, he is entitled to compensation when injured in the performance of duties incidental to his work for Mullins & Parker.
This is exactly what the Second Circuit held way back in 1943 in Collins v. Smith, *104 13 So.2d 72, a case never overruled and subsequently cited with favor over the years. The trial court properly followed Collins in awarding compensation herein. The present majority’s holding is in direct conflict with Collins (among other cases to he cited), presumably on that account alone entitling the plaintiff as of right to review by the Supreme Court to resolve this conflict between the circuits. Art. VII, Section 11, LSA-Constitution of 1921.
■ The Collins case concerned an identical .arrangement between the same International Paper Company and a supplier, Edgar B. Smith, by which Smith was given fhe exclusive right to deliver to it at a fixed price pulpwood within a specified ■territory, similar to Mullins & Parker’s ■arrangement herein with International 'Paper. The decedent Collins was killed ■while performing work for a subcontractor, 'W. F. Smith, who occupied a position identical to that of the plaintiff Bryant herein. •W. F. Smith had purchased the stumpage from the landowner, just as Bryant did in -'this case. Nevertheless both Smiths were •'held liable in compensation for the dece'dent’s death, even though the latter owned 'his own equipment, hired and paid his own helpers, was free to quit if and when he chose, or to haul as much wood as he desired ■ or not, etc.
In holding both Smiths liable the court noted: “[i]t is true, as argued, that neither of the Smiths exercised control or supervision over deceased’s operations, but this ' is not the true test to determine whether he ' was or was not an employee. The true test '•is whether the employer has the right to ■ exercise control and/or supervision over the operations.” 13 So.2d 73. It is to be noted that Edgar B. Smith — the exclusive supplier occupying the status of Mullins & Parker herein — could not have been held liable if he had been a “vendor” as argued here, a holding of the Collins case which the present majority overlooks.
The Collins holding has been adhered to over the years. In comparable situations, the subsequent jurisprudence has consistently pierced through paper "buyer-seller” relationships to hold that the so-called “buyer” who actually directs and controls the economic operations of the supplier is liable in compensation to those injured in the course of such operations. The “buyer” is regarded as actually paying for the performance of services in the processing of the timber products for his benefit, in addition to paying for the raw timber, when the legal mechanisms or actual factual relationship assure that the so-called “seller’s” operations will be directed primarily to fulfill the “buyer’s” economic needs rather than being a processing of products for sale on the open market. Stevens v. Mitchell, 234 La. 977, 102 So.2d 237; Jones v. Hennessey, 232 La. 786, 95 So.2d 312; Kline v. Dawson, 230 La. 901, 89 So.2d 385; Redding v. Cade, La.App. 3 Cir., 158 So.2d 880; Hatten v. Olin Mathieson Chemical Corp., La.App. 2 Cir., 112 So.2d 135, 136; Hebert v. Gates, La.App. 1 Cir., 50 So.2d 859; Deason v. Coal Operators Casualty Co., La. App. 2 Cir., 43 So.2d 630.
Similarly, in the ice cream vendor line of cases, the courts have adopted a realistic test of compensation liability. They have held the prime controller of the economic operations liable in compensation for those injured therein, piercing through paper arrangements by which attempts have been made to disguise practical economic control by a theoretical buyer-seller relationship. As stated in Sampson v. Borden Company, La.App. 1 Cir., 92 So.2d 152, 153, certiorari denied, summarizing this line of cases: “In deciding whether the alleged enterpriser is indeed an independent merchant retailing products purchased from a favored supplier, or instead in reality an employee working on a commission basis, the courts have uniformly examined the total economic relationship between the parties. Indicia which individually might not indicate other than a customer relationship, may in combination present a picture of practical economic control and direction by the supplier so as to constitute him — for *105 purposes of workmen’s compensation, at least — as the master or employer of the other. * * * [Citations omitted.]”
As Professor Malone has observed in his outstanding treatise, Louisiana Workmen’s Compensation Law (1962 pocket part, pp. 39-40) : “In practical effect the intermediary is no more than a contractor who is paid for severing and hauling the timber. * * In fact our courts have recognized that one may be the employee of another who has sold him goods when the seller controls the buyer’s conduct in the reselling of the same goods.” (Italics mine.)
In denying workmen’s compensation and in holding that there was a 'buyer-seller relationship, my brothers of the majority have relied upon Taylor v. Employers Mutual Liability Ins. Co., 220 La. 995, 58 So.2d 206, Garner v. Southern Pulpwood Insurance Co., La.App. 3 Cir., 149 So.2d 157, and Cerie v. Malone, La.App. 3 Cir., 125 So.2d 254. In my opinion, these cases are factually distinguishable and are not controlling herein. These concern instances where a timber product purchaser obtained timber rights in his own interest, then cut and hauled them and sold them on an open market arrangement to the buyer. In these instances, the buyer was held free of compensation liability because of his lack of economic control over the operations of the timber producer.
Aside from other factors of economic control to be listed below, the distinguishing feature in the present case, of course, is that the producer Bryant’s pulpwood cutting operations were determined in advance each week by orders received by him from Mullins & Parker. The producer Bryant here was not processing the timber products for sale on the open market — he was processing them pursuant to a pre-existing order from Mullins & Parker, and in order to satisfy Mullins & Parker’s contractual obligation to deliver so many cords of pulpwood that week to the International Paper Company. While engaged in fulfilling a' Mullins & Parker order, as the uncontradicted evidence shows, Bryant’s economic efforts were exclusively employed in producing-pulpwood to satisfy the purchase-order (the “tickets”) received by him the preceding-Saturday from Mullins & Parker. ;
The producer Bryant may have b.een theoretically free, if he wished, to refuse to fill the share of the Mullins & Parker purchase order allotted to him that week — that is, the number of “tickets” allotted him by Mullins & Parker, representing so many loads of pulpwood he was to deliver to International Paper for the account of Mullins & Parker. However, if he diverted the pulpwood he was cutting for Mullins & Parker to another source (and. the evidence indicates he never did so in. fact), he was subject to not receiving fur--ther steady work from Mullins & Parker. (In fact, the plaintiff had worked exclusive-^ ly for Mullins & Parker since 1952, except for a few short periods when the International Paper Plant had shut down, when by pre-arrangement with Mullins & Parker he had cut willow or cottonwood for Johns-Manville.)
Bryant’s alleged freedom not to -deliver wood ordered from him by Mullins & P'ark-er to satisfy that firm’s purchase order with International Paper Company, amounted to the same freedom that an hourly employee-for Ford Motor Company has to fail to report to work the following day. He is free to do so, but he may lose his job and he-' will lose his earnings for the period1 — and: as a matter of economic necessity he in fact does not exercise this theoretical freedom.
Bryant’s theoretical freedom, to quit working for Mullins & Parker does not, while he is performing work for Mullins & Parker, convert him from an employee>or contractor into an independent retailer. So long as his economic operations are conditioned on advance orders given to him by Mullins & Parker in order to satisfy that firm’s contract with International Paper, and so long as he is engaged in duties incidental to the performance-of this work, for *106 Mullins & Parker, Bryant is performing services for Mullins & Parker for purposes of the Louisiana compensation act, and-he is thus entitled to compensation benefits when, as here, injured in the duties incidental to the performance of work for Mullins & Parker.[2]
T can see little practical distinction between the present case and the economic •picture presented by the Kline, Redding, 'Hatten, and Hebert cases, cited above. In 'those, the defendant owned the timber, ■which he “-sold” to the producer, who then ■“resold” it after he had processed it. The ■courts there held that in actual economic fact the producer was being paid for his -services in processing the timber products, .-so that there was compensation liability >on the part of the principal procuring his ¡processing activities.
In the present instance, the plaintiff Bryant was engaged solely in producing pulpwood for the account of Mullins & Parker at the time of the accident, in accordance with orders received in advance each week from Mullins & Parker which determined that in fact the pulpwood he cut was to be ■delivered solely for the account of Mullins ■&. Parker, rather than to be produced for $a-le on the open market. Just as in the cited cas.es the timber the producer was processing Was ip reality (despite its paper title and a; theoretical ■ freedom to deliver it elsewhere) for the account of the principal, Just so' in the instant case the pulpwood here was-, being produced by Bryant in reality (despite 'its paper title and a theoretical freedom to deliver it elsewhere) for the account of Mullins & Parker. As in the cited Haití» case, the circumstance that the principal had the right to terminate the producer’s operations at will is extremely indicative of factual economic control inconsistent with an open-market buyer-seller relationship.

Summary in more detail of the evidence.

What we have emphasized previously in this dissent is the broad factual picture of economic control herein, and its consequences under the prior compensation jurisprudence. In order to understand the interrelationship between Bryant and Mullins & Parker more completely, however, it may be of interest to examine in detail the facts relating thereto.
Mullins & Parker was the exclusive supplier of pulpwood to the International Paper plant from the four adjacent parishes in Louisiana and the seven adjacent counties in Mississippi. Without a Mullins & Parker ticket, this plant did not accept delivery of pulpwood from a producer. There was no other market for pine, gum, and hardwood pulpwood in the area. (There was a market for cottonwood and willow at the Johns-Mansville masonite plant, to which such woods could be sold by a producer, if he could acquire “tickets” for that plant.)
As a matter of practical economic fact, Mullins & Parker held the power of economic life or death over the 15-20 pulpwood producers with which it had entered into standing arrangements to supply its weekly pulpwood needs. Without Mullins & Parker orders, there was no other market to produce pine, gum, and hardwood pulpwood. Further, the producers’ economic operations *107 during each week were dictated in advance by the number of tickets allotted each week to each by Mullins & Parker.
This circumstance alone, as indicated in the above-cited Collins case upon which the trial court relied, amounted to such practical economic control over the producers, as to make Mullins & Parker liable in compensation to a producer or his employees injured in the performance of duties incidental to the completion of these advance orders given by Mullins & Parker to cut pulpwood for its account.
Additionally, however, there are several other indicia of the economic control in fact exercised by Mullins & Parker over Bryant and the other producers favored by it with weekly pulpwood orders. Taking all of these indicia into consideration, it becomes plain beyond a doubt that the relationship between Mullins & Parker and Bryant was far more integrated than could be consistent with an open market buyer-purchaser.
At the risk of some repetition, and in order to set forth the total economic picture more fully, I shall set forth the following indicia of close economic control exercised by Mullins & Parker over Bryant:

1.Mullins & Parker determined if and how much Bryant worked each week.

As previously noted, Bryant’s economic operations were in fact determined each week by the number of tickets allotted him by Mullins & Parker, each representing a load of pulpwood to be delivered to the International Paper plant. There was in fact no other market for the pine-gum and hardwood pulpwood. Without such a ticket from Mullins & Parker, there was no use in a producer cutting any such pulpwood during the following week.
Although as a senior producer Bryant usually received all the tickets he requested, this was because of his work record with Mullins & Parker. As Mrs. Bryant stated, “The more you haul, the more you were allowed to haul, well as we hauled a good deal at the time, and that way we were allowed to get more tickets than someone else.” Tr. 102.
2. Bryant cut pulpwood for Mullins' & Parker to fill that firm’s order zvith International Paper, not for sale himself on the open market.
In the words of one of the Mullins & Parker partners, the weekly tickets allotted each week were actually “a purchase orders instruction from R. H. Parker to Interna;--•tional Paper Company to accept this load', of wood for our [Mullins & Parker] account.” Tr. 133. By the advance ' order-received from Mullins & Parker, the pulpwood which Bryant was cutting each.week: was not for sale on the open market; it was to fulfill the contract between Mullins. & Parker and International Paper Company calling for the supplying of so much pulpwood that week.
Although Bryant may theoretically have been free to bring the pulpwood to some other source (if he did not fear being fired from his long term arrangement with Mullins & Parker), as an actual matter of economic fact, as he stated, “There’s no where else to deliver it”, Tr. 57, than to the International Paper plant via the Mullins & Parker ticket
3. Mullins & Parker determined where Bryant zvorked.
Prior to working on the Blanche tracts, Bryant had been working for about a year on the Fisher tract, on which the stumpage was owned by Mullins & Parker and on which the work areas were assigned', by Mullins & Parker. Due to bad weather it was necessary to cease operations on the-Fisher tract. At that time, Thompson, the Mullins & Parker woods' supervisor; suggested to Bryant that he contact the Blanche proprietor to secure’ the pulpwood there:. Although technically it w-as'. Bryant who closed the deal for thé pulpwood, actually the acquisition resulted from prior nego *108 tiations by Thompson ascertaining the availability of the wood for Mullins & Parker; and in fact the landowner entered into the transaction in reliance upon the fact that the pulpwood was being produced for the account of Mullins & Parker. See testimony of land-owner at 121-123; see testimony of Thompson at 171-172, 175; see testimony of Bryant, Tr. 75-76.
, Bryant may have been free in theory to disregard suggestions of Thompson as to where to conduct his pulpwood operations, -but as a matter of practical economic fact he followed the suggestions of this Mullins & Parker official, who spent approximately two to three days per week in Louisiana locating pulpwood and checking on the pulpwood operations of the Mullins .& Parker producers.

4.The relationship between Bryant and Mullins & Parker was a continuing one, which could be terminated at will by Mullins & Parker (as well as by Bryant).

The uncontradicted evidence shows that Bryant had been working as a Mullins & Parker producer since 1952. He had worked for them exclusively, except for a few very short periods when the International Paper plant shut down. In these instances, by pre-arrangement with Mullins & Parker and with their assistance in securing “tickets” for the Johns-Manville plant, Bryant cut cottonwood and willow for this masonite plant, when there was a market for it.
On a few rare occasions (the last of which had been three or four years before, Tr. 52), after cutting the pine and gum from a landowner’s tract for Mullins & Parker, the willow and cottonwood was then cut for Johns-Manville in order to satisfy the landowner and generally as a part of the arrangement made by Mullins & Parker with him.
In the case of the Blanche tract on which Bryant was working at the time of the accident, he did intend eventually to cut the cottonwood and willow for Johns-Manville if International Paper Company would not take it. However, at the time of the accident, his operations were exclusively conducted to fulfill the Mullins & Parker order to supply gum and pine pulpwood to the International Paper Company.
The Mullins & Parker partners denied each agreement between them and each producer with which they entered into a standing long-term arrangement to supply the Mullins & Parker pulpwood needs, contemplated that such producer should work exclusively for Mullins & Parker during the period of the agreement. In fact, however, as Bryant and another pulpwood producer testified without contradiction, the Mullins & Parker pulpwood producers regarded themselves as being obligated to work exclusively for Mullins & Parker during the period of their standing arrangements with such firm.
5. Mullins & Parker fixed the maximum stumpage price of $3-00 to be paid the landowner.
See Bryant’s testimony, Tr. 78, 92, Tr. 250. The maximum stumpage price was fixed to prevent the price of pulpwood from increasing in the area. Mullins & Parker therefore did not permit its pulpwood producers to agree to pay stumpage to the landowner in excess of $3.00 per cord. Although a Mullins & Parker partner disagreed that this was a policy of the firm, he did admit that as a matter of fact the pulpwood producers do not pay over a certain amount for stumpage. Tr. 135. (Of course, if Mullins & Parker were really buying on the open market, it should have been immaterial to them how much of the gross price paid by them was paid by the producer as stumpage to the landowner.)
6. Stumpage was always deducted from Bryanfs deliveries of pulpwood and paid directly to the landowner.
Bryant stated that such was a matter of Mullins & Parker policy. The partners *109 denied this. In fact, however, in every instance Bryant’s pulpwood operations were handled in this manner, under Bryant’s understanding that this was a required Mullins & Parker policy. Bryant indicated as one reason for this policy that Mullins & Parker had once paid out stumpage a second time to a landowner, when the landowner’s stumpage had been improperly retained by an intermediary through whom it was supposed to be paid to the landowner.
7. Mullins & Parker in fact financed all of Bryant’s operations.
Mullins & Parker not only gave Bryant the orders each week for the number of loads of pulpwood he was to produce and deliver. It also maintained a general store and commissary and a running account by which it financed all of Bryant’s current operations, including the furnishing of repairs and parts.
In this regard, the Bryant ledger sheet with Mullins & Parker is extremely instructive. See Exhibit D-l, Tr. 181. This shows that Bryant regularly drew sums in round amounts ($150 to $200, etc.) and also regularly charged various repairs and parts performed for or sold to him at the Mullins & Parker commissary. Also charged against his account, for instance, were severance taxes, accident insurance, interest upon his bank note, etc. Credited against these debits were the loads of pulpwood delivered weekly, which were credited in amounts that did not necessarily correspond even approximately with the weekly advances.
Bryant drew advances from Mullins & Parker for his living expenses and his own payroll. In all other respects, however, Mullins & Parker conducted his bookkeeping and handled all the proceeds and expenses of his operations for him in its ledger sheet, including the payment of severance taxes, insurance, and interest due by Bryant on his business operations. Bryant’s function was simply to cut and deliver pulpwood to the International Paper Company for the Mullins & Parker account, and to receive in turn credit from Mullins & Parker on his ledger sheet with such firm for timber delivered to International Paper for said partnership.
Bryant was “free” to have his repairs made and to purchase his supplies from sources other than the Mullins & Parker commissary in the same sense that a pauper is free to spend a riotous evening at the Blue Room of the Roosevelt Hotel. He can in theory, but as a matter of fact his credit and the practical realities of economic life do not permit him to do so.
8. Bryant was consistently indebted to Mullins & Parker.
In the first place, while it is true that Mullins & Parker did not finance directly Bryant’s equipment purchases, nevertheless such partnership was the endorser on a fourteen thousand dollar note owed by him to the bank for such purchases. See testimony of Mullins & Parker partner, p. 163. When the interest became due, Mullins & Parker simply paid same and charged the amount to Bryant’s account with it. Tr. 163, 181.
In addition to this large outstanding note, which would become immediately due if Mullins & Parker failed to pay the interest or failed to re-endorse it at maturity, Bryant was consistently indebted on his open running current account for between one thousand and fifteen hundred dollars, representing the balance of advances, repairs, equipment, interest, and insurance paid by Mullins & Parker in excess of the amounts credited for pulpwood delivered. See ledger sheet, Exhibit D-l, Tr. 181.
The Supreme Court has already noted the control exercisable over a pulpwood producer by reason of a large indebtedness, by reason of which the principal in fact directs the producer’s operations and is not an open market purchaser from him. Jones v. Hennessey, 232 La. 786, 95 So.2d 312.
*110 9. Mullins & Parker required Bryant to report to it regularly precise payroll ■ information.
See Mrs. Bryant’s testimony, Tr. 108-109; see partner’s testimony, Tr. 165, and Exhibit P-5 at Tr. 241 (miscalled P-7 and P-8 in testimony, but identified by testimony as the same as the exhibit marked in evidence as P-5).
.These report forms, required by Mullins & Parker of Bryant for each workweek, were to show each of Bryant’s employees’ name, address, signature, and social security number, and the daily number of produced pieces and the daily number of hours worked by each such employee. Although a Mullins & Parker partner stated that producers such as Bryant were only required to list the employees’ names, addresses, and birthdates, the forms themselves in evidence indicate that the more complete information above-listed was required. And in fact, as is conceded, this complete payroll information was indeed regularly given by Bryant to Mullins & Parker.

Summary.

Although perhaps most of the above in-dicia might individually be explained as being consistent with a vendor-vendee relationship, in combination the indicia point unmistakably to the complete economic control exercisable and exercised in fact by Mullins & Parker over Bryant’s operations. It is obvious that, in the face -of this intertwined relationship and the actual economic control of Bryant by Mullins & Parker, Bryant was not in fact a producer cutting and 'delivering pulpwood for sale on the open market: he was in fact either an employee or an independent contractor performing -his operations in the interest of and under the. practical economic control of Mullins & Parker.
, The circumstance that Bryant occasionally had cut wood, for, Johns-Manville in the past, and that he intended in the present instance to deliver to Johns-Manville any willow and cottonwood on the tract on which engaged during the period of the accident, if International Paper did not need it, are immaterial to decision of the present question; for the evidence reflects that during the period of the accident, the plaintiff Bryant was exclusively engaged in producing pulpwood for the account of Mullins & Parker. (Had the injury occurred when Bryant was conducting, operations, solely for Johns-Manville, or both for Johns-Manville and Mullins & Parker, then of course a different question would be presented.)
Viewing the identical contractual relationships between Mullins & Parker and one of its producers in Mississippi, the Supreme Court of that state summarized as correctly characterizing the relationship the testimony of the producer that “Mullins, on Saturdays, gave orders for the following week, directing how many loads of wood should be hauled, what kind of timber should be cut, whether pine or gum, and how to cut the same; that the timber could not have been sold to anyone other than Mullins; and that Mullins had complete control over their operations.” Mullins & Parker v. Rucker, 237 Miss. 330, 114 So.2d 761, 763 (1959), affirming an award of compensation to one of the producer’s sub-employees.
The legal effect of the total arrangement between the parties was that Mullins & Parker had either employed or contracted with its pulpwood producers for them to cut and haul pulpwood at so much a cord, in fulfillment of the purchase order received by Mullins & Parker from the International Paper Company each week at a higher amount per cord. (The difference represented the Mullins & Parker gross profit on each load delivered.) The payment by-Mullins & Parker to the pulpwood producer was remuneration for the latter’s services in cutting and hauling the pulpwood (as well as, of course, to compensate the landowner for the timber thus cut and hauled by the producer).
*111 It was Mullins & Parker which sold the pulpwood to the International Paper Company, not the pulpwood producer himself. Further, the arrangements between Mullins & Parker and the producer did not constitute an open-market purchase of pulpwood from the producer by Mullins & Parker, with a resale by it to International Paper; for the pulpwood was cut and delivered only as ordered in advance by Mullins & Parker from the producer, and it was •delivered solely for the account of Mullins & Parker in fulfillment of the latter’s contract with the International Paper Company.

“Independent Contractor” Status of Bryant.

An additional circumstance of error by ••the majority is its holding that Bryant was a vendor instead of an independent contractor simply because he was not obligated to cut any certain amount of pulpwood and "because he did not incur any obligation if he failed to deliver any certain amount of pulpwood to Mullins & Parker. In so holding, the majority relies on Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483 and Shelton v. Barber Brothers Co., La.App. 1 Cir., ■94 So.2d 489.
In the cited cases, of course, the question at issue was whether a relationship nominally designated as that of principal-contractor was in reality that of employer-employee because of the greater factual .control in actuality exercised by the alleged “principal”. The criteria mentioned "by the majority actually are incidents used to determine whether or not in fact the ac■tual control (the power to terminate, etc.) .exercisable by the principal indicated that in reality an employee instead of a subcontractor status is occupied by the person responsible for performance of work for the alleged “principal”.
Thus, the criteria relied upon by the majority, instead of showing that Bryant was .a “vendor” rather than a subcontractor, .under the jurisprudence actually tends to show that he was an employee instead of an independent contractor.
The Louisiana compensation act defines an “Independent Contractor” as a person who renders service “for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished * * LSA-R.S. 23 :- 1021(6). While the greater economic control exercised by Mullins & Parker over Bryant points more to an employee than a subcontractor relationship, nevertheless, at the very least, Bryant’s relationship with Mullins & Parker fits the above statutory definition: he cut pulpwood at so much a cord (per unit), under the control of Mullins & Parker as to the results of his work (e. g., each stick not longer than six feet, broader than four inches, etc.)
One can search in vain the hundreds of independent contractor cases decided under the Louisiana workmen’s compensation law without finding any Louisiana decision holding that a timber processor was not an independent contractor just because (as in the usual such relationship in the timber industry) he is paid only so much per cord delivered, without any liability upon him if he fails to deliver any specified number of cords.
On his point alone, if the present majority opinion stands, it will represent'a great leap backward in our compensation jurisprudence, and it will create confusion where there is none now, inevitably causing further litigation as principals seek to debar from the benefits of the compensation act those whom the jurisprudence has regarded for over forty years as independent contractors, as well as their employees.

Conclusion.

For the foregoing reasons, I must respectfully dissent from the majority’s reversal of the learned trial court, who correctly applied the previous jurisprudence to *112 the present facts and properly awarded compensation to the crippled plaintiff.
On Application for Rehearing.
En Banc. Rehearing denied.
TATE, J., dissents from denial of rehearing.

. A distinction immaterial in tliis case, as the majority notes, because a substantial part of Bryant’s duties were manual labor, so that he is entitled to compensa- • tion, if classified either as an employee or as a contractor.

. Bryant' Was not injured when cutting or ■ delivering pulpwood for Mullins & Packer. However, he was injured in connection with saw repairs being performed in connection with the pulpwood operations conducted for Mullins & Parker; the injury thus arises out of and is incidental to the work for Mullins & Parker, :since it is the result of some risk to ' which ho was subjected' as a result of his employment and was reasonably within the scope of tilings contemplated by the employment. Edwards v. Louisiana Forestry Commission, 221 La. 818, 60 So.2d 449; Kern v. Southport Mull, 174 La. 432, 41 So. 19; Shird v. Maride, La.App. 3 Cir., 156 So.2d 476; Willis v. Cloud, La. App. 3 Cir., 151 So.2d 379; Malone, Louisiana Workmen’s Compensation Law (1951), Chapter 9, especially Sections 192, 196.