59 So.2d 892 (1952)
LIVINGSTON
v.
HENRY & HALL et al.
No. 7819.
Court of Appeal of Louisiana, Second Circuit.
June 18, 1952.
Rehearing Denied July 7, 1952.
Cook, Clark & Egan, Shreveport, for appellants.
Godfrey & Edwards, Many, for appellee.
McINNIS, Judge.
This is a suit by the widow for herself and two children for compensation on account of the death of her husband, who was shot and killed by a man named H. E. Lovelady, on May 21, 1950. The defendants are Henry & Hall, a commercial partnership, which had a subcontract to hard-surface a part of the Many-Pendleton Ferry Highway in Sabine Parish, and its compensation insurer, Aetna Casualty & Surety Company.
Plaintiff alleges that for sometime prior to May 21, 1950, her husband was employed by the defendant partnership as a truck driver and laborer in connection with the hard-surfacing of the above named highway, and that under the terms of his employment he was working where he was killed; that Lovelady drove his truck near where the work was being done, and for a time followed the workers, to the *893 knowledge of the foreman, and that Lovelady called her husband to the truck he (Lovelady) was driving and shot him and killed him; that there was no aggression on her husband's part; that the killing arose out of decedent's employment and in the course thereof; that on May 5, 1950, Lovelady had become embittered at those doing the road construction, including deceased, had threatened the road crew with firearms, and had directed his abuse particularly toward deceased; that the disturbance arose directly from the fact that the work was in progress and in turn resulted in or contributed to the killing; that the disturbance took place on the highway near the home of Lovelady.
The wage of deceased is alleged to be $52.50 per week, and funeral expenses of $300 are demanded.
A plea of vagueness was filed and answered, setting forth more of the details of the difficulty of May 5, 1950. An exception of no cause or right of action was then filed. This exception was submitted on briefs to be filed. The minutes of court do not disclose any further action on the exception, and it is not mentioned in the written opinion of the district judge. However, plaintiff says in brief that it was referred to the merits.
Defendants then answered, denying all the substantial allegations of plaintiff's original and amended petition, and alleging that the wage of deceased was $30 per week. As a special defense it is alleged that the fatal shooting of Livingston by Lovelady resulted from personal difficulty between the men, brought on by personal attentions which Livingston was directing toward Lovelady's wife, which was the sole cause of the shooting; that the killing did not occur within the course and scope of Livingston's employment, nor did it arise out of his employment.
After trial on the merits, the district judge, for reasons assigned in writing, rendered judgment in favor of plaintiff for compensation for 300 weeks, beginning May 21, 1950, at the rate of $24.15 per week, until January 9, 1951, and thereafter at the rate of $30 per week, and for $202 burial expenses, with interest and costs. From this judgment defendants are prosecuting suspensive and devolutive appeal.
There is no serious controversy as to the rate of pay of deceased. Defendants in argument and brief in this court made no mention of the amount fixed by the judgment, but stand on the proposition that there can be no recovery at all, and this is the question for determination.
There are two theories as to the reason Lovelady killed the deceased. That of plaintiff is that the killing was the aftermath of the difficulty on May 5, 1950. On that day the road crew was blacktopping a section of the road near the home of Lovelady. In order to surface the road, short sections of it would have to be closed to traffic for fifteen to thirty minutes, while gravel was being applied on top of the asphalt. A man named Bordelon, from Texas, drove up with his wife in the car and was told he would have to wait a few minutes. He insisted on going through and Livingston was told to place the truck he was driving crossway of the road so as to effectively block passage of vehicles. Bordelon still insisted on going through and got out of his car and encountered Dewitt LaFiette, an employee of the Department of Highways, and LaFiette knocked him down. Bordelon and his wife then went in the yard of Lovelady, who was there with his brother, Cecil, and the Loveladys gave Bordelon a pistol and his wife a rifle, whereupon LaFiette left and did not hear any more.
Jimmie Wray was one of the truck drivers on the job and he saw and heard the trouble. He says that Bordelon and the Loveladys were cursing all the people on the road work as long as he was there, but he soon left in the truck he was driving.
Defendants contend that the difficulty of May 5, 1950 had no connection with the killing, but that Livingston had been paying attention to Lovelady's wife, and that the killing took place when Lovelady ordered deceased to stay away from his wife and his property, and after deceased tried to pull a pistol. In support of this theory defendants offered Earl Nutt, foreman for Henry & Hall, an eyewitness to the shooting, *894 Douglas Bush, an oil field worker, and H. E. Lovelady, Livingston's slayer.
Before going into the testimony given by these witnesses, it is well to note that Lovelady had been tried in criminal court for the murder of Livingston, and the testimony had been taken down and transcribed. The judge in this civil case did not preside at the trial of the criminal case. Lovelady was acquitted.
Nutt, Bush and Lovelady testified on the trial of the criminal case. Nutt did not want to tell about the killing, saying he had already testified in the criminal case, but the judge ordered him to testify and he did. He did not undertake to give the conversation between Lovelady and Livingston when Lovelady called Livingston to the truck, as he said, to talk to him, but said that the conversation concerned some family affairs, "the way I understood it." He is certain that Livingston had no gun. He had heard of the trouble of May 5, 1950, but was not out there when it happened.
Bush testified that on several occasions he had carried Livingston to Lovelady's home and let him out of the car and driven on to his own home. He says that Livingston told him he was going to see Lovelady's wife, and that he asked what he would do if Lovelady caught him there, and that he replied: "He wouldn't ever live to tell it."
Lovelady testified that he called Livingston to his truck to talk to him, and told him to leave his (Lovelady's) wife alone, and to stay away from his place. He said that he had noticed the attentions of Livingston to her, and that he would put his arm around her and kiss her, and that he practically lived with her sister while her husband was in the army; that on Thursday night before the killing, his wife had told him that Livingston wanted her to go away with him, and that he would take care of him (Lovelady). He said that he told Livingston if he would stay away from his place he would let him go, and not kill him, but that Livingston then tried to pull a gun out of his shirt and that he shot him in self-defense. He said he carried the gun in the truck all of the time. He never told anyone about deceased having a gun until trial of the criminal case.
He said also that at the time, he was on the way to his father-in-law's home, where his wife had gone Friday morning, intending to try to get her to come back home, and that he had not expected to find Livingston out on the road because it was Sunday and he was not supposed to work on Sunday.
The record discloses that defendant was given the right to take the deposition of Cecil Lovelady who was in the truck with his brother when the shooting took place, but it is not in the record. The failure of Mrs. H. E. Lovelady, summoned by defendants, to appear is explained. Failure of Doug Carter, summoned by both plaintiff and defendants, to appear as a witness, is explained.
The district judge found, among others, the following facts:
"There is quite a bit of evidence in the record concerning an occurrence that happened on the Many-Pendleton Highway near the Lovelady residence on May 5, 1950, the plaintiff attempting to show a casual (sic) connection between this happening and the homicide of May 21, 1950. In our opinion there is no connection whatever between the two events.
"There is some testimony to the effect that at the time Lovelady shot deceased that Livingston was armed and that an attempt was made by Livingston to pull a gun which was concealed under his clothing. This we do not believe.
"It is our opinion, and we believe we are fully justified in our conclusion from the testimony, that Lovelady shot and killed Livingston for one and only one reason, and that was because of the relationship which Lovelady believed existed between Livingston and Lovelady's wife.
"We have a situation here where Lovelady had suspected for some time that Livingston was too friendly with Lovelady's wife. On the night of Friday, May 19, 1950, Lovelady's wife had left him and, according to his testimony, just prior to leaving had told him something of her conversation with *895 Livingston regarding their affairs. It is reasonable to believe that Lovelady was of the opinion that Livingston had alienated his wife's affection, at any rate she left him and had gone to her father's house.

* * * * * *
"On May 21, 1950, Lovelady was apparently attempting to bring about a reconciliation between himself and his wife, and made at least one trip to his father-in-law's in an attempt to get his wife to make up, which seems to have been without avail. It is reasonable to believe that Lovelady was emotionally upset, and as he passed along the road he saw the man whom he thought to be the cause of his marital difficulties. Being in the frame of mind that he was, we believe he became inflamed at the presence of Livingston and decided to have it out. As to whether Lovelady had made up his mind to kill Livingston when he stopped, or whether it was some taunting remark that Livingston made which caused Lovelady to kill him, there is no way of knowing. However, we are firmly convinced that the presence of Livingston on the Many-Pendleton Highway, between the home of Lovelady and his father-in-law's, on this particular occasion was what caused him to be killed. There is nothing in the record to show that Livingston would have been at this place on the date he was killed if it were not for the fact he was employed by Henry & Hall."
Counsel for plaintiff disagrees with the finding of the district judge that there was no causal connection between the difficulty on May 5, 1950 and the killing of deceased. The judge knows the people involved in the case and his finding of fact is entitled to careful consideration. We find it somewhat difficult to reconcile this finding of fact with the finding that deceased was not armed and that he did not try to pull a gun. The judge did not believe this part of Lovelady's testimony. It may be that the judge did not believe this part of the testimony, and believed the part about Livingston's relations with Lovelady's wife. It may be that Lovelady and his attorney were of the opinion that the plea of self-defense was better than the unwritten law, which often avails an accused. In other words, if the jury could be convinced that Livingston had added insult to injury by trying to kill Lovelady after having alienated his wife's affections, the chance of acquittal would be greatly enhanced. Of course, the district judge must, of necessity, reject the testimony to the effect that deceased was trying to kill Lovelady, and that the killing was in self-defense, because in that event deceased would have been the aggressor and no recovery could be had. From the facts found it is clear that the judgment was based on the fact that deceased would not have lost his life except for the fact that he was working on the road at the particular time and place when his assailant was on his way to try to effect a reconciliation with his wife.
We are in agreement with the conclusion of the district judge that defendants are liable, and the award he has fixed appears to be supported by the record.
We are, we believe, fully fortified in this conclusion by the clarifying opinion of our Supreme Court in the case of Edwards v. Louisiana Forestry Commission, 60 So.2d 449, reversing the judgment of this court, and citing numerous authorities from our own and other jurisdictions which we believe it unnecessary to set forth in detail here.
It is true that the facts of the Edwards case are different from the facts of the case we are considering; however, the decision in the Edwards case quotes with approval from Hartford Accident & Indemnity Company v. Cardillo, 72 App.D.C. 52, 112 F.2d 11, certiorari denied by U. S. Supreme Court, 309 U.S. 689, 60 S.Ct. 891, 84 L.Ed. 1032, the following:
"* * * no more is necessary than that the work subject the employee to a peril which comes from the fact that he is required to be in the place where it strikes when it does so. It is immaterial whether the place is the employer's premises or a street; whether *896 the risk arises from physical features or human agencies connected with the place; whether it is a common occurrence or an extraordinary happening; one which threatens only employees at work or others also."
The work of the deceased in this case required him to be at the place where he was shot and killed.
Defendants contend that there can be no recovery in this case because he was shot and killed because of his attentions to Lovelady's wife, and because he was the aggressor, having attempted to draw a gun from his shirt, and for the further reason that he was not at the time doing any work, having turned aside to talk to his killer when called. Of course, if the testimony that deceased tried to get his gun to shoot is believed, deceased was the aggressor, but this testimony is unbelievable.
The numerous cases cited in defendants' brief on the other contentions are noted and discussed in the Edwards case, supra, and, in our opinion, the pronouncements of the Edward case are applicable also to this case.
It, therefore, follows that the judgment appealed from is affirmed at the cost of defendants-appellants in both courts.
HARDY, J., dissents, giving written reasons.
GLADNEY, J., concurs, being of the opinion the instant case falls within the "zone of special danger" doctrine as pronounced by the Supreme Court recently in Edwards v. Louisiana Forestry Commission, 60 So.2d 449.
HARDY, Judge (dissenting).
In my opinion the expression of the view of the majority of this Court represents a startling and, to me, a dangerous extension of what is commonly known as the "time and place" factor in compensation claims.
In his written opinion the District Judge made a finding of fact, which is concurred in by this Court, as follows:
"It is our opinion, and we believe we are fully justified in our conclusion from the testimony, that Lovelady shot and killed Livingston for one and only one reason and that was because of the relationship which Lovelady believed existed between Livingston and Lovelady's wife."
Yet, despite the above finding of fact, this Court has elected to predicate its judgment on the fact:
"That deceased would not have lost his life except for the fact that he was working on the road at the particular time and place when his assailant was on his way to try to effect a reconciliation with his wife."
We think this observation presupposes an excursion into the realm of omniscience, and indicates a familiarity with metaphysical imponderables which is not justified by the facts.
If an employee chooses to break the laws of society and convention, we cannot subscribe to the doctrine that an injury inflicted by the individual primarily affected should be attributed to the employment of the offender, as a consequence of which the employer is penalized for the intentional and wilful act of the employee in the satisfaction of his own desires. Is a thief to be protected at the expense of an employer when he is confronted by the party from whom he has stolen his possessions? Under this theory a robber, a kidnapper, an adulterer will be rewarded, by the enforcement of a fiction of law, for his very misdeeds and transgressions.
The majority opinion points to the recent opinion of the Supreme Court in Edwards v. Louisiana Forestry Commission, and, while admitting that the facts are entirely distinct from those comprehended in the instant case, it nevertheless attempts to apply the general principle there enunciated. In turn, the majority opinion quotes from Hartford Accident & Indemnity Company v. Cardillo, 72 App.D.C. 52, 112 F.2d 11, certiorari denied by U. S. Supreme Court, 309 U.S. 689, 60 S.Ct. 891, 84 L.Ed. 1032, to the effect that:

*897 "* * * no more is necessary than that the work subject the employee to a peril which comes from the fact that he is required to be in the place where it strikes when it does so."
I insist that the conclusion is irrational by reason of the fact that no court can say with certainty that the so-called peril would not have struck at another place and another time.
In this instance the conclusion upon the basis of the established facts is inescapable, namely, that the peril was induced by the wrongdoing, or suspected wrongdoing, of the employee. In effecting the conclusion which has been accepted by the majority we may as well say that the job, the work, the duties of the employee brought him into contact with temptation to which he yielded, and, therefore, the employer is liable.
I am thoroughly cognizant of the fact that the Court may well refuse to inquire into the cause of the "accident" and look only at the effect of the application of the "time and place" doctrine. Nevertheless, I submit that there should properly be a consideration of both cause and effect.
Parenthetically I cannot refrain from observing that the result of this holding, for all practical purposes, recognizes the employer as the insurer of the employee. And I confess that under the present trend of jurisprudence this conclusion would be a short cut, and perhaps a satisfactory and justified one, to the resolution of all compensation claims. My difference with this trend is predicated upon the proposition that courts should, and in my opinion, eventually will return to an exclusive concept of those concerns which interpret rather than make legislation. Laws and statutes enacted by a legislative body should be construed in accordance with their exact provisions and express intent and purpose. Otherwise confusion must ensue. There is no foundation for advice, guidance and counsel on the part of practicing attorneys to their clients so long as the effects of laws are subject to change in purpose and application by courts.
We have become involved with too many wordstoo many so-called reasonstoo many finely drawn distinctions and differences. The truth is that we live in a social age and our sympathies, judicial and personal, are allied with the claimant in almost every case. This condition is intolerable from the judicial view and inconsistent with our obligations. The "pass the buck" vulgarism is particularly apropros to our present functioning, though at complete variance with our professed principles.
Until the executive, legislative and judicial branches of goverment return to an austere recognition of and responsibility for their own duties in their respective fields, this condition of confusion, uncertainty and vague concept will persist.
For the reasons stated I respectfully dissent from the opinion of the majority of this Court.
Rehearing denied; HARDY, J., dissenting.