341 So.2d 35 (1976)
Shirley Jordan MITCHELL, Individually and as natural tutrix of her children, Plaintiff and Appellee,
v.
EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN et al., Defendants and Appellants.
No. 5732.
Court of Appeal of Louisiana, Third Circuit.
December 21, 1976.
Rehearing Denied January 26, 1977.
Writ Refused March 18, 1977.
*36 Jack O. Brittain, Natchitoches, for defendants and appellants.
G. F. Thomas, Jr., Natchitoches, for plaintiff and appellee.
Gahagan & Gahagan by H. C. Gahagan, Jr., Natchitoches, for third-party defendant-appellee.
Before CULPEPPER, WATSON and GUIDRY, JJ.
CULPEPPER, Judge.
This is a suit for death benefits under the Workmen's Compensation Act. Plaintiffs are the widow and minor children of Sam Mitchell, who worked as supervisor of a chicken catching crew for the defendant, J&M Poultry, Inc. One night Mitchell was sitting in his pickup truck with a Mrs. Durr about one-fourth of a mile from the chicken house where his crew was working. Mrs. Durr's husband shot and killed Mitchell and fatally wounded her. The district judge found Mitchell's death arose out of and in the course of his employment. From a judgment awarding benefits but denying penalties and attorney's fees, defendants appealed. Plaintiff answered the appeal, seeking penalties and attorney's fees.
The decisive issue is whether Mitchell's death resulted from an accident "arising out of and in the course of his employment", within the meaning of the Workmen's Compensation Act.
Defendant J&M Poultry, Inc. is in the chicken processing business. Employees of J&M gather chickens from various chicken farms for live shipment by truck to the company's processing plant in Alexandria, Louisiana. The chicken gathering or "catching" is accomplished by crews of 8 to 10 persons who go into large chicken houses located on farms of contract growers and physically catch the chickens and load them into shipping crates. These chicken catching crews work only at night because chickens are easier to catch in the dark. Depending upon the number of chickens at each farm, a crew might work at as many as three chicken farms in one night.
All catching, crating and trucking operations at the chicken farms are directed and controlled by an employee entitled "crew *37 supervisor". Crew supervisors do not catch chickens, nor does J&M require that they maintain a constant vigil over the actual chicken catching operation. Instead, each crew supervisor is "his own boss" at the jobsite and is given considerable latitude in the method he employs to satisfy the objective of seeing that all of the chickens are caught, crated and trucked away. Often, crew supervisors are required to leave the jobsite in order to secure machine parts or to perform other tasks necessary for the completion of the job. In addition, J&M allows its crew supervisors to leave the jobsite to perform business of a personal nature unrelated to the job.
Sammy Mitchell was a crew supervisor for J&M. The record shows that he and his crew of chicken catchers were working at a chicken farm in a rural area of Sabine Parish on the evening and night of September 10, 1975. Mr. Mitchell left the jobsite on at least two occasions after the catching operations commenced. Early in the evening he left the site in his own pickup truck to tell Johnny Carline, a J&M truck driver, how to get his truck to the chicken houses. This first absence occurred at about 6:00 p.m. and lasted for about 15 minutes. Later, Mr. Mitchell again drove away from the jobsite in his pickup truck. He apparently drove down the dirt road leading from the chicken house where his crew was working and turned onto Louisiana Highway 175. After turning onto the highway, he encountered fellow-employee, Dennis McFerrin, who was driving a J&M chicken truck. Mr. Mitchell and Mr. McFerrin stopped their vehicles on the side of the highway near its intersection with the dirt road and began a conversation. A second pickup truck driven by Janet Moran approached the two men. Riding with Janet Moran were her two year old son and Martha Durr, the wife of Chester T. Durr. Upon seeing the Moran vehicle, Mitchell ended his conversation with McFerrin and drove a short distance down the highway where he parked at a small store. Janet Moran followed Mitchell to the store, which was closed, and parked her truck beside Mitchell's truck. Mr. Mitchell told Janet Moran to follow him in her truck. Mr. Mitchell then led the way as the two trucks traveled back down the highway and onto the dirt road leading to the chicken houses where his crew was working. Mitchell drove approximately 200 yards down the dirt road and parked at a cleared area adjacent to the road. Janet Moran parked her truck next to Mitchell's truck. This secluded parking spot was surrounded by woods and could not be seen from the chicken house where the crew was working about one-fourth of a mile away.
Janet Moran related the following sequence of events leading to the death of Mr. Mitchell and the fatal wounding of Mrs. Durr. First, Janet Moran, Mr. Mitchell and Mrs. Durr listened to a tape playing in one of the trucks. Mitchell then announced that he was going to the jobsite to tell a truck driver, Johnny Carline, to drive his loaded chicken truck back to the shop. He then left in his pickup truck and returned about 15 minutes later. (Johnny Carline testified that he saw Mitchell only once on the night of September 10, at about 6:00 or 6:30 p.m.) Upon Mitchell's return, the two women got in his truck, Mrs. Durr next to Mitchell and Mrs. Moran on the right. Mitchell drank coffee while he and his two female companions conversed. After Mitchell had been back for about 20 minutes, Chester T. Durr, husband of Mrs. Durr, arrived at the parking spot in his pickup truck. A brief conversation between Mr. and Mrs. Durr ensued. Mr. Durr asked his wife if she was coming home, to which she replied "No". Immediately after hearing his wife's negative response, Mr. Durr shot both Mr. Mitchell and his wife with a small caliber pistol. Mitchell died almost immediately. Mrs. Durr died later of complications from her wounds. Mrs. Moran was not injured. The shooting occurred at about 9:00 p.m.
Mitchell's wife testified she knew that Mr. Durr had accused her husband of "having an affair" with Mrs. Durr. Janet Moran testified that on several previous occasions she had taken Mrs. Durr to meet Sammy Mitchell at the farms where his crew was working. She also testified that *38 she knew that Mrs. Durr went with her on the night of the killing in order to meet Mr. Mitchell. A truck driver, Johnny Carline, testified that Mitchell and Mrs. Durr met at jobsites five or six times during one and one-half to two months immediately preceding the killing, and each time they met they drove away together in Mitchell's truck and did not return until one and one-half or two hours later.
Mr. and Mrs. Durr had separated three days prior to the killing, and Mrs. Durr was living in the house trailer of her friend, Mrs. Moran.
Mr. Durr was also employed by J&M at the time of the shooting. He was a truck driver for a crew other than the one supervised by Mitchell, and was off duty at the time of the killing. His wife, Martha Durr, was previously employed as a chicken catcher in Mitchell's crew, but she was not an employee of J&M on the night of Mitchell's death. Janet Moran was a friend of William Mitchell, Sammy Mitchell's brother. William Mitchell was a member of his brother's chicken catching crew on the night of the killing.
The employer conspicuously posted a written rule forbidding its employees from having visitors at the farms where they worked. This rule was in effect at the time of Mitchell's death, and in all probability, he knew of its existence.
The above review of the facts is substantially the same as the finding of facts stated in the trial court's written reasons for judgment.
Section 23:1031 of the Workmen's Compensation Act provides that the employer shall pay compensation to the employee who "receives personal injury by accident arising out of and in the course of his employment." Our appellate courts have often turned to Professor Malone's Treatise on Workmen's Compensation (Malone, La. Workmen's Compensation Law (1951) hereinafter cited simply as Malone), for guidance in interpreting these two requirements. In the recent case of Lisonbee v. Chicago Mill & Lumber Company, La., 278 So.2d 5 (1973), involving an assault on an employee by a gunman during work hours, Justice Summers stated his synopsis of applicable sections of Professor Malone's Treatise:
"The terms arising out of and in the course of are not synonymous. The former suggests an inquiry into the character or origin of the risk, while the latter brings into focus the time and place relationship between the risk and the employment. The two requirements cannot, however, be considered in isolation from each other. A strong showing by the claimant with reference to the arise-out-of requirement may compensate for a relatively weak showing on the during-course-of requirement, or vice versa. As a corollary it follows that whenever the showing with respect to both requirements is relatively weak a denial of compensation is indicated." Malone, Sections 162 and 192.
Speaking specifically of assault cases, Professor Malone suggests this formula "* * * [T]he risk of assault should be administered like the risk of lightning or tornado, through the time-place rule of the Kern decision. [Kern v. Southport Mill, Limited, 174 La. 432, 141 So. 19 (1932)]. If the employee was actively engaged in the performance of duties, * * * or even if he was taking a short permissible rest from his labor, he should be protected against assault without reference to the nature of the difficulty that prompted the attack or the identity of his assailant. If, however, at the time of the aggression the victim was only barely within the course of his employment, it may be necessary and proper to determine whether the circumstances under which he worked enhanced the danger of assault." [See Myers v. Louisiana Railway & Navigation Company, 140 La. 937, 74 So. 256 (1917)], Malone, Sec. 194. (Emphasis supplied)
Professor Malone's analysis harmonizes the seemingly conflicting rules of the Myers case (increased risk doctrine) and the Kerns case (time, place, circumstance doctrine) into a workable formula for solving problems presented by assault cases. We *39 have applied the formula to the present case and we conclude that the trial court erred in awarding compensation. Mitchell was not within the course of his employment at the time of his death, and clearly the circumstances under which he worked did not enhance the danger of the assault which resulted in his death. Having stated in broad terms the law applicable to this case and our conclusions, we move now to a more detailed analysis of the in-course-of and arise-out-of requirements.

IN THE COURSE OF EMPLOYMENT
The phrase "in the course of" suggests an inquiry into the time and place relationship between the risk and the employment. Malone, Section 162. "An accident occurs during the course of the employment when it occurs during the time of the employment and at a place contemplated by the employment." Lisonbee v. Chicago Mill & Lumber Company, supra. There is no question that Mr. Mitchell suffered his fatal gunshot wound during the hours or time of his employment. There is, however, a serious question as to whether Mitchell was at a place contemplated by his employment when he died.
What was Mr. Mitchell's place of employment? There is no simple answer to this question. Mitchell was a supervisory employee who had no clearly defined place of work. In order to perform his job he often was required to leave the site where his crew was catching chickens to relay messages to other employees or to get parts necessary to keep the loading machines and other equipment in operating condition. In addition, the employer tolerated absences from the jobsite occasioned by the crew supervisor's performance of business of a personal nature.
As a general rule, an accident that happens while an employee is actively engaged in the performance of his duties during working hours will be regarded as having occurred in the course of his employment.Kern v. Southport Mill, supra, Malone, Section 163. Mitchell would be at a place of employment and within the course of his employment at any location where performance of his duties reasonably required him to be. Thus, Mitchell would be within the course of his employment when he was actively supervising his crew or when he was necessarily engaged about his employer's business at places other than the chicken farms where his crew was working. In addition, Mitchell would be within the course of his employment while traveling between places where his employment required his presence. See Malone, Section 174 and cases discussed therein.
"As a general proposition, the employee who abandons his work, with or without permission, for the purpose of attending to his personal business is not acting within the course and scope of his employment... [T]his generalization does not apply to permitted rest periods when the employee is attending to his bodily comforts or convenience or is engaged in recreation.... But the employee who leaves his work for his own affairs has separated himself from his employment for the time being and is not entitled to compensation if he is injured.... Even if the employer would tolerate the departure, the period may be outside the course of the employment, if the time consumed by the rest is greater than is ordinarily allowed for rest periods, or if the purpose of the departure is not the expectable convenience or comfort for which such periods are provided." Malone, Sec. 167. (Emphasis supplied)
We conclude that Mitchell was pursuing his own personal business or pleasure when he absented himself from his place of employment during his unreasonably lengthy meeting with the wife of his assailant. There is no evidence indicating that Mitchell's employment necessitated the meeting, nor is there any evidence indicating that the meeting furthered in any way the interest of the employer. The meeting may have been a minor deviation from the work place in terms of distance, but it was not incidental to Mitchell's employment.
Plaintiff argues the meeting between Mr. Mitchell and Mrs. Durr was a "coffee *40 break" of the type permitted by the employer. It would be manifestly unreasonable to hold that Mitchell was on a "coffee break" contemplated by his employment when he drove to a secluded place in the company of another man's wife and remained there for about 45 minutes, including the brief interval when Mitchell said he was returning to the jobsite.
Also relevant, though not decisive of the question of course of employment, is the fact that the employer had a rule prohibiting its employees from having visitors on the chicken farms. Technically, Mitchell was not violating the rule at the time of his death, because he received his visitors at a location which was not a part of the chicken farm. The rule does show, however, that the employer would not tolerate or condone meetings of the type Mitchell was engaged in at the time he was shot.
Before moving from the analysis of course and scope of employment, we wish to make additional comments regarding Lisonbee v. Chicago Mill & Lumber Company, supra. Lisonbee was employed as a uniformed, armed guard at a mill. He left his guard post in violation of a company rule and crossed the street to a store where he bought a snack and began talking to the store proprietor. While Lisonbee was talking in the store, a gunman entered and shot the salesclerk. Lisonbee drew his pistol and exchanged shots with the gunman. In the exchange, Lisonbee suffered a fatal wound. Our Supreme Court concluded that the accident did not befall Lisonbee in the course of his employment. His absence from the place of employment in direct violation of a company rule took him outside the course of his employment. The court concluded that Lisonbee had abandoned his post and duties, because he was engaged in "conversation and activities that diverted his attention from [his] work." Lisonbee's presence at the store was, in the view of the court, purely a matter of personal convenience.
The Lisonbee case is in some respects remarkably similar to the present case. In both cases, an employee was shot during work hours. In both cases, the employee abandoned his duties to pursue a matter of personal convenience or pleasure. In both cases, the activity the employee was involved in at the time of the injury was not at the direction or in the interest of the employer. Distinguishing features of the nature of employment, however, prevent us from citing Lisonbee as our sole authority. Unlike Lisonbee, Mitchell had no clearly defined place of employment. He was allowed to leave the site where his chicken crew was working and indeed was sometimes required to leave. Mitchell, unlike Lisonbee, did not violate a rule when he left the site where his crew was working. Considering the general principles which underly the Lisonbee holding, however, it is clear that Mitchell was not within the course of his employment when he was shot.

ARISING OUT OF EMPLOYMENT
In Lisonbee the court stated:
"To `arise out of' the employment, the accident must be the result of some risk to which the employee is subjected in the course of his employment and to which he would not have been subjected had he not been so employed. Time, place and circumstance must determine this. Kern v. Southport Mill, supra. Add to this a consideration of the character of the risk, which means `The accident must be the result of some risk to which the employee is subjected in the course of his employment and to which he would not have been subjected had he not been so employed." Further explaining the quoted rule, Mr. Justice Provosty, as organ of the court, in Myers v. Louisiana Ry. & Nav. Co., 140 La. 937, 74 So. 256 (1917), said: `It ought to be sufficient that the nature of the employment was such that the risk from which the injury resulted was greater for the workman than for a person not engaged in the employment.'"
Essentially, the court in Lisonbee employed the formula suggested by Professor Malone when it applied both the increased risk doctrine of the Myers case and the time, place and circumstance test of the Kern case. Applying the Kern test to the *41 present case, Mitchell's employment did not require him to be at the place of the accident when it occurred. Furthermore, Mitchell was not engaged in his employer's business, but instead was pursuing his own business or pleasure.
Having concluded that the accident did not arise out of the employment under the liberal rule laid down in the Kern case, there is some question as to whether it is necessary that we also apply the "increased risk" test of the Myers case. We do so, however, because the Supreme Court applied both the Myers and Kern tests in Lisonbee. An analysis of the court's reasoning in application of the "increased risk" test in Lisonbee will facilitate our application of the test to the facts of the present case.
In Lisonbee, the court was impressed by the fact that all others at the scene of the shooting, including the salesclerk and the store proprietor, were subjected to risk of injuries from gun shots. The court concluded that the risk of injury at the hands of the gunman was no greater for Lisonbee than it was for the store employees. Justice Summers stated that Lisonbee would have been subjected to the risk of gun shot whether he was employed or not. Considering these factors, the accident was held not to be one arising out of Lisonbee's employment.
If we apply the same reasoning to the present case, we must conclude that the risk of death to Mitchell was no greater than the risk to Mrs. Durr or Janet Moran. Mitchell would have been subjected to the risk of Mr. Durr's gun whether he was employed or not, just as Mrs. Durr and Janet Moran were.
In this case, as in the Lisonbee case, only the time element of the various factors considered necessary to satisfy the arising out of and in the course of the employment requirement of the Workmen's Compensation Act have been satisfied. "This alone is not a proper basis for an award of compensation," Lisonbee, supra.
Plaintiff argues that the cases of Rogers v. Aetna Insurance Company, 173 So.2d 231 (La.App.3rd Cir. 1965), writs refused, and Gorings v. Edwards, 222 So.2d 530 (La.App.4th Cir. 1969), are authority for awarding compensation benefits in the present case. We disagree. The two cited cases are readily distinguishable from the present case. In both cases, the assault on the employee occurred on the employer's premises during work hours while the employees were engaged about the business of their employers. In neither case was the employee pursuing his own personal pleasure at a location separated from his work place. In the present case, of course, Mitchell was not on the premises of his employer, nor was he engaged about his employer's business at the time of his death. The present case is therefore distinguishable from the two cited by plaintiff and from the following cases in which compensation was awarded to employees who were assaulted while clearly within the course and scope of their employment: Ferguson v. Cady-McFarland Gravel Co., 156 La. 871, 101 So. 248 (1924); Livingston v. Henry & Hall, 59 So.2d 892 (La.App.2d Cir. 1952); Williams v. United States Casualty Co., 145 So.2d 592 (La.App.4th Cir. 1952); O'Connor v. American Mutual Liability Insurance Co., 87 So.2d 16 (La.App.Orl., 1956). See also Malone, Sec. 194.
As Justice Summers explained in Lisonbee, although the terms "arising out of" and "in the course of" are not synonymous, they should not be considered in isolation from each other. A strong showing for one may compensate for a weak showing in the other. In the present case, the showing for each is, at best, weak.

STATUTORY PENALTIES AND ATTORNEY'S FEES
Having concluded benefits must be denied, penalties and attorney's fees are also denied.
For the reasons assigned, the judgment appealed is reversed and set aside. Judgment is now rendered in favor of defendants, *42 rejecting plaintiff's demands at their costs.

REVERSED AND RENDERED.
WATSON, J., concurs and assigns brief written reasons.
WATSON, Judge (concurring):
I concur in the well-written opinion adopted by the majority. Since this type of case is quite difficult and I recently authored the opinion in Turner v. United States Fidelity & Guaranty Company, 339 So.2d 917 (La.App. 3 Cir. 1976), which involved the same legal principles but a different result, I wish to delineate the distinguishing features of the two cases.
In Turner there was no question that the plaintiff was in the course of his employment, since the accident happened during working hours and Turner was physically on the employer's premises. There was a strong showing of "course of" employment in Turner. In Mitchell, the present case, the deceased was not on the premises and there was no showing that he was engaged in the employer's business at the time of the accident. In Turner, there was at least a moderate showing of "arising out of" the employment in that the gun had been brought on the premises by a fellow employee, had been there some time, had been cleaned on the premises, and the presence of the gun was tolerated by the employer. In Mitchell, the only connection with employment is that Mr. Durr was a fellow employee, although off-duty at the time of the shooting, and Mrs. Durr was a former employee. Mitchell is weak in both features: "arising out of" and "course of" employment. Thus, Turner met the requirements of "course of" and "arising out of" employment, while Mitchell does not.
For these additional reasons, I concur.